STATE FARM FIRE & CASUALTY COMPANY, Petitioner,

v.

James and Cynthia SIMMONS, Respondents.

No. D–4095.

Supreme Court of Texas.

Argued Oct. 8, 1997.

Decided Feb. 13, 1998.

Katherine D. Mackillop, Joy M. Soloway, William J. Boyce, Houston, for Petitioner.

James C. Plummer, Houston, Larry Zinn, San Antonio, for Respondents.

SPECTOR, Justice, delivered the opinion of the Court, in which PHILLIPS, Chief Justice, GONZALEZ, BAKER, ABBOTT and HANKINSON, Justices, join.

The two principal issues in this cause are whether legally sufficient evidence supports a jury's finding that an insurer breached its duty of good faith and fair dealing and whether there is some evidence to support a punitive damages award. The court of appeals answered each question affirmatively. 857 S.W.2d 126, 137. We reverse the punitive damages award, but render judgment awarding the Simmonses enhanced damages under the DTPA. We affirm the court of appeals' judgment in all other respects.

## I. Background

James and Cynthia Simmons purchased their first home in 1983, financed by a Veterans Administration loan. The house was located on a large lot in a semi-rural part of Montgomery County. After buying the house, the Simmonses bought a homeowners insurance policy from State Farm Fire & Casualty Insurance.

In the year and a half after the Simmonses and their two young children moved into the house, they substantially improved the property. They installed a driveway and sidewalk, remodeled the bathroom, improved the home's water well, and, for safety's sake, moved a butane fuel tank farther from the house. To indulge his "love for hogs," James constructed a hog pen with the hope of eventually purchasing some stock. He also built a dining room table for his wife and beds for each of his children, as well as a mantel and a number of picture frames.

In the first year after the Simmonses bought the house, James, a construction supervisor, experienced some down-time from work. Consequently, the Simmonses missed several monthly mortgage payments. As a result, in January 1985, to make up for the missed payments, the Simmonses worked out a repayment schedule with the VA that allowed them to make weekly payments of $185 in lieu of their monthly mortgage obligation of $603. Thereafter, most of the weekly payments the Simmonses made were for $190 or $200. They made their last weekly payment in late April 1985.

In the same month the Simmonses worked out their repayment schedule, someone burglarized their home. Several items, including a television, silverware, a shotgun, and the children's piggy banks, were stolen. Although the burglary occurred during the day, none of the Simmonses' neighbors saw anything amiss. The burglars apparently entered the house through one of two doors at the back of the house. After the burglary, James followed the tracks of a wheelbarrow through the woods abutting the Simmonses' house to the nearby home of eighteen- or nineteen-year-old Tim Mattix. There, James confronted Mattix and another youth, James Wooddell, about the burglary. James Simmons called the police, but the police made no arrest at that time. Mattix later confessed to the police that he had committed the burglary in company with James and Charles Wooddell. State Farm paid the Simmonses $7,069 for their claim within a few weeks of the burglary.

After James's confrontation with Mattix and Wooddell, the Simmonses experienced a

spate of vandalism: their telephone line was tapped into, eggs were smashed in their mailbox, and their dog died under circumstances that caused James, who had studied animal husbandry at Prairie View A & M University, to suspect that someone had poisoned the dog. Within a couple of weeks of the burglary, Cynthia returned home one day to find that someone had again entered the house, although nothing appeared to have been stolen at that time.

On Sunday, June 2, 1985, some time between 1:30 and 2:00 a.m., the Simmonses, along with James's mother, left the house to take the children to Cynthia's aunt's home in rural Louisiana for the summer. They planned to return that evening so that James could be at work the next day. The Simmonses locked all of the doors and windows before they departed. A short time after the family left, Irene Lawrence, who was delivering newspapers, noticed smoke emanating from the Simmonses' house. Within a few minutes, Lawrence reported the fire. Firefighters responded to the fire, but to no avail. When the Simmonses returned late Sunday afternoon, they found their home totally destroyed.

The Simmonses reported the loss to their State Farm agent the next day. The claim was immediately tagged as "suspicious" because of the relatively recent theft claim. State Farm soon referred the claim to an adjuster in what later came to be known as State Farm's Special Investigation Unit. Four months later, in October, State Farm denied the claim.

Thirteen months later, the Simmonses sued State Farm. State Farm asserted arson as an affirmative defense. The jury found that the Simmonses had not burned their home, thus establishing coverage under the policy. State Farm does not contest that finding in this Court. The jury also found that State Farm had breached its duty of good faith and fair dealing in handling the Simmonses' claim and knowingly violated the Deceptive Trade Practice—Consumer Protection Act. Finally, the jury found that State Farm acted with conscious indifference in determining whether there was a reasonable basis to deny the Simmonses' claim. Based upon those findings, the district court rendered judgment for the Simmonses for $275,000 in actual damages and $2 million in punitive damages. The court of appeals affirmed that judgment. 857 S.W.2d at 142.

## II. Bad faith

State Farm contends that the finding that State Farm breached its duty of good faith and fair dealing is not supported by legally sufficient evidence. We disagree.

This Court recently clarified the standard for recovery in bad faith cases. In *Universe Life Insurance Company v. Giles*, we held that an insurer breaches its duty of good faith and fair dealing by denying a claim when the insurer's liability has become reasonably clear. 950 S.W.2d 48, 56 (Tex. 1997). Evidence establishing only a bona fide coverage dispute does not demonstrate bad faith. *State Farm Lloyds v. Nicolau*, 951 S.W.2d 444, 448 (Tex.1997); *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 17 (Tex.1994). But an insurer cannot insulate itself from bad faith liability by investigating a claim in a manner calculated to construct a pretextual basis for denial. *See Nicolau*, 951 S.W.2d at 448; *National Union Fire Ins. Co. v. Dominguez*, 873 S.W.2d 373, 376 (Tex. 1994); *Lyons v. Millers Cas. Ins. Co.*, 866 S.W.2d 597, 601 (Tex.1993).

As State Farm conceded at oral argument, whether an insurer has breached its duty of good faith and fair dealing is a fact issue. *See Giles*, 950 S.W.2d at 56, and *id.* at 81 (Enoch, J., concurring). In determining whether the evidence is legally sufficient to support a bad faith judgment, we resolve all conflicts in the evidence and draw all inferences in favor of the jury's findings. *Id.* at 51. Viewing the evidence in this case in the light most favorable to the judgment, the evidence is legally sufficient that State Farm breached its duty of good faith and fair dealing by denying the Simmonses' claim based upon a biased investigation intended to construct a pretextual basis for denial. An insurance company's obligation to investigate is obviously not unlimited. The scope of the appropriate investigation will vary with the claim's nature and value and the complexity

of the factual issues involved. Here, however-er, the testimony of State Farm's own ex-perts, as well as its own internal documents, established the deficiencies in the company's review of the Simmonses' claim.

### A.

The Simmonses produced evidence from which the jury could logically infer that State Farm did not make a good-faith effort to objectively investigate the Simmonses' claim, but instead engaged in an outcome-oriented investigation designed to place the Simmonses at the center of an "arson trian-gle."[1] The Simmonses' fire loss claim was immediately deemed "suspicious" because of the earlier theft claim. In fact, by the time State Farm denied the fire claim, the legiti-macy of the earlier burglary claim was un-questionable. The police had returned a shotgun taken in the burglary to the Sim-monses, which James turned over to State Farm because the company had paid for it in settling the burglary claim.

Further, there was evidence that State Farm's investigation was not reasonable be-cause State Farm failed to investigate the possibility that other potential suspects might have started the fire. At trial, Mike Hvasta, State Farm's adjuster, testified that revenge and spite are some of the more common motivations for arson. The Mont-gomery County fire marshal also testified that spite and revenge were the leading moti-vations for arson fires in the county in 1985. In their statements to State Farm, the Sim-monses had identified five people who may have had grudges against them, including Mattix and the Wooddells. Yet, there is evidence that State Farm never attempted to locate or contact any of these potential sus-pects, even though Hvasta's preliminary combined fire report listed locating them as an unfinished item of investigation.

State Farm's explanation for its failure to attempt to contact Mattix and the Wooddells was contradictory. At trial, Hvasta first tes-tified that he did not contact them because he could not locate them. When confronted with his deposition testimony, however, he conceded that his explanation at that time was that he felt that it was "not important" to do so. He also acknowledged that he never learned during his investigation that Mattix, who lived just down the road from the Simmonses, had confessed to burglariz-ing the Simmonses' home and been released from jail only two weeks before the fire. In fact, the evidence established that State Farm was unaware of that fact until some four years after it closed its investigation of the Simmonses' claim. In light of Hvasta's combined fire report, his testimony that spite and revenge are frequent motives for arson, and his testimony that "it was important for [him] to do everything [he] could to get information with regard to th[e] claim before [he] made a final decision," the jury could logically conclude that State Farm's investi-gation was biased and unreasonable.

The testimony about the burglars by State Farm's claims supervisor, Joe Tabor, provid-ed further evidence from which the jury could infer that State Farm conducted its investigation in a manner designed, not to discover the objective facts, but only to de-feat coverage. While Tabor agreed that an insurer should look at the motives of others besides its insureds, he testified that State Farm did not pursue Mattix because of the physical evidence; *i.e.*, the house was locked and there was no evidence of forced entry. Yet State Farm's own report on the fire's cause and origin concluded that "no evidence of forced entry could be established due to the heavy damage throughout the area." Ta-bor also testified that State Farm had elimi-nated Mattix as a suspect because "Mattix had confessed to the burglary and certainly had no grievance at this point against the Simmons." The jury may well have rejected this entire explanation as inherently incredi-ble.

### B.

Additional evidence suggested that State Farm did not objectively investigate the Sim-

---

1. Arson is an affirmative defense to an insurance claim for a loss resulting from a fire. The "arson triangle" refers to a means of establishing that defense by offering circumstantial evidence that the insured had a motive and the opportunity to set a fire and that the fire had an incendiary origin.

monses' claim. Hvasta and Tabor described the common indicators of insurance fraud by arson. These include: (1) a recently purchased policy or a recently increased policy; (2) a policy that significantly exceeds the insured property's value; (3) efforts by the insured to sell the property or other concrete indications that the insured intended to move; (4) prior fire losses; (5) a strong alibi for the insured; (6) unusual money problems, such as high medical bills or legal fees; (7) the removal of furniture or personal items before the fire; or, (8) a "huge [financial] burden" resulting from the strain of meeting everyday expenses. The evidence was undisputed that none of the first six criteria were met.

As to the seventh criterion, State Farm attempted to show that the Simmonses had removed their clothing from the house before the fire. However, other evidence put that fact issue in dispute. Cynthia Simmons testified that, although she had packed most of the children's summer clothes for the trip, the Simmonses left behind the children's winter clothes and clothing that they had outgrown. In addition, Hvasta's claim activity log noted that the Simmonses' master bedroom closet did contain clothing and shoes. There was also evidence that the Simmonses lost irreplaceable personal items in the fire, including James's track awards and the family Bible.

Finally, as to the eighth criterion, the jury heard evidence that the Simmonses' financial situation was no different from what they were accustomed to over the course of their marriage. Although James had experienced some down time from work at about the time the Simmonses first missed some of their monthly mortgage payments, that situation had improved by the time of the fire. The evidence also showed that State Farm had concluded, based upon conversations with the Veterans Administration, that the Simmonses' monthly mortgage obligation was $1,343 per month. But, in reality, the Simmonses were only obliged to make $185 weekly payments in lieu of their $603 monthly mortgage payment. State Farm's figure thus overstated the amount the Simmonses were required to pay by more than $540 a month.

State Farm also was under the erroneous impression that the Simmonses had not made any mortgage payments since January 1985. Coupled with evidence of the inadequacies in State Farm's investigation, this evidence tends to support an inference that State Farm denied the claim in bad faith.

### C.

State Farm's primary contention at trial was that it properly denied the Simmonses' claim because the company reasonably believed that the Simmonses had a strong financial motive to burn their home. The claims committee report that formed the basis for State Farm's denial of the Simmonses' claim stated that "the motive for this fire was to relieve the financial burden of the mortgage." And Tabor reiterated at trial that "the motive was certainly to get out from under the mortgage." But the evidence at trial called into question the reasonableness and credibility of State Farm's reliance on that motive.

The evidence was undisputed that the Simmonses' mortgage obligation exceeded the policy limits on their homeowners insurance by several thousand dollars. If the Simmonses had actually burned their house, they would have been left with no home and a deficiency owed to their mortgage lender. This fact may have suggested to the jury, in light of the other evidence, that State Farm's fundamental premise about the Simmonses' motivation was so lacking in credibility as to imply bad faith.

### D.

At trial, Hvasta, State Farm's adjuster, described an insurer's investigative responsibilities in some detail. He testified that policyholders reasonably expect insurers to thoroughly and adequately investigate claims, to disclose material facts, and to give policyholders the benefit of the doubt. He further testified that an adjuster should approach a policyholder to help resolve apparent conflicts. However, in this case, both of the Simmonses testified that State Farm never revealed that it believed there was a discrepancy between the information the Simmonses had provided about their mortgage obligation

and the information State Farm had obtained from other sources. Based upon Hvasta's description of an insurer's obligations, the jury could have inferred that a reasonable insurer would have approached its insureds to resolve apparently conflicting information and would have eventually concluded that the insureds lacked a sufficient motive to commit arson.

State Farm attempts to minimize the importance of its misunderstanding of the Simmonses' mortgage obligations, as it did at trial, by pointing to other evidence that the Simmonses were under some financial strain, even with a lower monthly mortgage obligation. This contention is inconsistent with Tabor's testimony that the claims committee report, which assumed a $1,343 obligation in calculating the Simmonses' expenses, was the basis upon which State Farm made its decision. Viewing the evidence in the light most favorable to the judgment, the jury could reasonably have concluded that this was nothing more than *post hoc* rationalization on State Farm's part.

Before this Court, State Farm argues that the deficiencies in its investigation do not support liability because the Simmonses have not identified any particular step that would have made State Farm's liability reasonably clear. In essence, State Farm takes the position that the Simmonses' bad faith claim must fail because they did not prove that someone else burned their home. But it is the insurer that has the duty to reasonably investigate a claim, not the insured. *See Giles*, 950 S.W.2d at 51. To adopt State Farm's position would simply turn that duty on its head. Under the investigation standards State Farm's own experts identified, there was more than a scintilla of evidence that State Farm's investigation was materially deficient. We hold that the evidence is legally sufficient that State Farm breached its duty of good faith and fair dealing.

### III. Punitive damages

The trial court awarded the Simmonses punitive damages of $2 million based upon the jury's finding that State Farm acted with conscious indifference in denying the Simmonses' claim. State Farm asserts that the evidence in the record is legally insufficient to support an award of punitive damages. We agree.

In *Moriel*, we clarified the requirements for the imposition of punitive damages in a bad faith case. A plaintiff may not recover punitive damages merely because the insurer has breached its duty of good faith and fair dealing. *Moriel*, 879 S.W.2d at 18. Instead, "[o]nly when accompanied by malicious, intentional, fraudulent, or grossly negligent conduct does bad faith justify punitive damages." *Id.* Accordingly, the Simmonses were required to introduce evidence showing that State Farm "was actually aware that its action would probably result in extraordinary harm not ordinarily associated with breach of contract or bad faith denial of a claim—such as death, grievous physical injury, or financial ruin." *Id.* at 24.

The Simmonses rely primarily upon the fact that State Farm never paid the lienholder on their property, the VA, in arguing that the punitive damages in this case were awarded in compliance with *Moriel*—that is, State Farm was actually aware that its denial of the claim was likely to result in the Simmonses' financial ruin. In conjunction with the deficiencies in State Farm's investigation outlined above, the Simmonses argue, State Farm's failure to pay the VA establishes that State Farm's conduct was "guided by an evil mind," justifying punitive damages. *See Moriel*, 879 S.W.2d at 18 (quoting *Rawlings v. Apodaca*, 151 Ariz. 149, 726 P.2d 565, 578 (1986)).

The evidence is undisputed, however, that State Farm contacted the VA and agreed to pay it the policy limits of $47,000 in exchange for an assignment of the VA's lien. Sam Bernardino, the responsible VA loan officer, testified that the VA had actually intended to accept the policy limits and convey the property to State Farm, after foreclosing on the property in order to establish the deficiency between the policy limits and accrued interest. This transaction was never completed, though, because the VA "failed to monitor; and [the property] went under [the VA's]

property management section, and it was just sold."

In light of State Farm's undisputed efforts to settle with the VA, we cannot conclude that State Farm was actually aware that its actions were likely to result in financial ruin to the Simmonses. Thus, we hold that the evidence is legally insufficient to support the punitive damages award in this case.

## IV. DTPA liability

The jury also found that State Farm had knowingly violated the DTPA, and that the violation was a producing cause of damages to the Simmonses. However, the Simmonses elected to recover on their common-law bad faith claim. Because we hold that the evidence is legally insufficient to support a punitive damages award, the Simmonses are entitled to additional damages under the DTPA. Before this Court, State Farm argues that the evidence is legally insufficient to support liability under the DTPA because it did not violate its duty of good faith and fair dealing in denying the Simmonses' claim; as a result, State Farm asserts, any DTPA violations could not have been the producing cause of any damage to the Simmonses. Because we hold that the evidence is legally sufficient to support common-law liability, we need not consider this issue.

## V. Conclusion

In summary, we hold that there is some evidence to support the jury's finding that State Farm breached its duty of good faith and fair dealing. We further hold that the evidence is legally insufficient to support the punitive damages award in this case. Accordingly, we affirm the judgment of the court of appeals in part, reverse it in part, and render judgment for additional damages for the Simmonses in accordance with the jury's finding that State Farm knowingly violated the DTPA.

ENOCH, J., dissenting.

HECHT, J., joined by OWEN, J., dissenting.

HECHT, Justice, joined by OWEN, Justice, dissenting.

The tort of bad faith has two elements, one objective and the other subjective. Plaintiff must prove both "that the insurer had no reasonable basis for denying or delaying payment of the claim, and that it knew or should have known that fact." *Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 18 (Tex.1994). The Court has recently held that the objective element is satisfied by proof that an insurer denied or delayed payment of a claim after liability was reasonably clear. *Universe Life Ins. Co. v. Giles,* 950 S.W.2d 48, 55–56 (Tex.1997).

Today the Court holds that an insurer who conducts "a biased investigation intended to construct a pretextual basis for denial" of its insured's claim may be liable for breach of its duty of good faith and fair dealing. *Ante* at 44. But that is true only if, in the end, the basis for denying the claim actually *is* pretextual. Bad faith liability requires proof not only of the subjective element but also of the objective element. Before an insurer can be in bad faith for the way it investigated a claim, there must be evidence not only that it was wrongly motivated but that a differently conducted investigation would have shown the claim to be reasonably clear. An insurer who willfully ignores evidence supportive of a claim risks bad faith liability; an insurer who ignores irrelevant evidence does not. An insurer who sets out to fabricate a basis for denying a claim but finds instead solid grounds for denial is no more in bad faith than the insurer who seeks a pretext for denial but then decides to allow the claim after all. The insurer's bias and intent become relevant only when it appears that the insurer denied a claim when liability was reasonably clear. Then the fact that the insurer was not simply mistaken but wrongly motivated becomes important.

The burden of proving both elements of bad faith is on the insured. In this case, the Simmonses contend that State Farm acted in bad faith because it conducted a biased investigation designed to find some pretext for denying their claim. State Farm argues, I think with some force, that there is no evidence of such misconduct. But even if there

were such evidence, State Farm argues that there must also be evidence of the objective element of bad faith liability—here, that but for a biased investigation, it would have been reasonably clear that the Simmonses' claim should have been allowed. As the Court states: "State Farm argues that the deficiencies in its investigation do not support liability because the Simmonses have not identified any particular step that would have made State Farm's liability reasonably clear." *Ante* at 47. The Court rejects this argument, not because the Simmonses have proved how State Farm's liability on their claim would have been reasonably clear if only its investigation had not been deficient, but because the Court concludes that the Simmonses are not required to offer such proof. The Simmonses, the Court holds, have met their burden of proof merely by showing that State Farm's investigation was deficient. The Court reasons that because the insurer, not the insured, is obliged to investigate a claim, an insured meets its burden of proof as to both the objective and subjective elements of bad faith liability by showing that the investigation was deficient in some respect. The Court's conclusion is crystal clear:

> Under the investigation standards State Farm's own experts identified, there was more than a scintilla of evidence that State Farm's investigation was materially deficient. We hold that the evidence is legally sufficient that State Farm breached its duty of good faith and fair dealing.

*Ante* at 47. In other words, proof that an insurer's investigation was deficient in some respect is enough for bad faith liability.

In effect, the Court shifts to the insurer the burden of proving that the insured's claim would not have been reasonably clear even if its investigation had not been deficient. To leave the burden on the insured, the Court appears to think, would obligate the insured to conduct some investigation of his own. While an insured should be obliged to present his insurer with whatever evidence the insured has or hopes may be supportive of his claim, no duty should fall on an insured to investigate his own claim in the same sense in which the insurer must investi-

gate the claim. But even if an insured has no obligation to investigate his claim, when an insured alleges bad faith he is obliged to prove the elements of that tort to recover. He cannot merely assert that the insurer's investigation was deficient, whatever the insurer's motivation, and then rest his case. To recover for bad faith, he must show that the deficient investigation led the insurer to deny the claim when liability was reasonably clear.

Here, the Simmonses have failed to show how their claim would have been reasonably clear but for State Farm's deficient investigation. The Simmonses' central argument, and the one the Court focuses on, is that State Farm did not interrogate all the people who might have been able to shed light on the origin of the fire that destroyed their home. The Simmonses argue, for example, that State Farm was wrong in failing to question the paper delivery woman who first discovered the fire. But at oral argument the Simmonses' counsel admitted that he had interviewed the woman before trial and that she knew nothing helpful to the Simmonses' case. Undaunted by this partial setback, the Simmonses continue to argue that State Farm should have contacted the neighborhood hooligans who had burgled and perhaps vandalized their home, but there is not the remotest hint in the record that they would have been more helpful to the Simmonses' cause than the paper delivery woman. If anything, one could reasonably expect that the young offenders would have denied arson just as they denied burglary. The Simmonses' decision to interview the paper delivery woman and no one else suggests that they themselves did not expect anything to be gained by further effort. State Farm cannot be faulted for having shared that same expectation.

The Simmonses argue that State Farm's bias was apparent in its persistent belief that they had financial reasons to burn down their home. It is true that State Farm initially overestimated the Simmonses' financial burdens, but the mistake was corrected before State Farm denied the claim. The facts are that the Simmonses had such trouble making timely mortgage payments that their lender

required weekly rather than monthly payments, that from the time of that requirement until seven weeks before the fire the Simmonses made only a little over seventy percent of their payments, that the Simmonses made no mortgage payments at all the seven weeks before the fire, and that the Simmonses owed about as much on their home as it was insured for. The record does not indicate whether the Simmonses knew at the time of the fire what equity they had in their home or that relief from weekly obligations would not be to their benefit. In retrospect, had the Simmonses known their true financial situation, they would not have been justified in thinking that destroying their home would relieve them of any significant financial burden, and thus they would have had no motive for arson. But what they actually knew or thought is surmise. From the facts it is not reasonably clear whether or not the Simmonses had a financial motivation to burn their home. But more importantly, on the issue of bad faith, no different investigation would have shown different facts.

The Simmonses also object to State Farm's initial characterization of the fire's origins as suspicious. But the truth is, the fire's origins *were* suspicious. The Simmonses themselves believe the fire was set. They argue that the proximity of the fire's origin to their time of departure in the wee hours of the morning can be explained by the possibility that arsonists were waiting in the bushes for them to leave. There is strong evidence of arson in this case; what is unclear is who set the fire.

The Court affirms a judgment of over $1 million against State Farm for deficiencies in its investigation. Yet whatever those deficiencies were, the facts concerning the Simmonses' fire are almost entirely disputed. The Simmonses cannot show how State Farm would have learned something more if only it had been more thorough or more objective in its investigation. Rather, the Simmonses argue that on the facts available, State Farm should have paid their claim. State Farm concedes coverage, but a mistake in determining coverage is not bad faith. There is nothing more here.

Although the Court bases liability in this case squarely and entirely on evidence of what it regards as a deficient investigation, I doubt the Court will apply the same rule in other cases. That is, the Court does not intend to impose bad faith liability on every insured whose investigation is "deficient" in some particular. The decision in this case, as in most bad faith cases, lamentably, is driven not nearly so much by legal principles as by the belief of individual judges that State Farm was not entirely fair and should pay the Simmonses some money. There is bad faith in insurance claims processing, and when it occurs, insureds should have a remedy. Until we formulate a body of law that defines bad faith sufficiently, we continue with our we-know-it-when-we-see-it approach that does little to change the lottery-like nature of the bad faith cause of action.

I continue to believe that the Court's bad faith decisions refuse to give adequate definition to the tort of bad faith. *See Giles,* 950 S.W.2d at 58–79 (Hecht, J., dissenting); *State Farm Lloyds v. Nicolau,* 951 S.W.2d 444, 453–464 (Tex.1997) (Hecht, J., dissenting). I agree with JUSTICE ENOCH that today's opinion adds to the confusion. I do not agree with him, however, that bad faith liability is based on a failure to act as a reasonable insurer would. That is a negligence test which is not and should not apply in the context of bad faith. *Giles,* 950 S.W.2d at 64–65, 73 (Hecht, J., dissenting). Bad faith is no more negligence than accidentally causing a car wreck is bad faith.

I would hold that there is no evidence of bad faith in this case. Accordingly, I respectfully dissent.

ENOCH, Justice, dissenting.

I agree with the Court that an insurer cannot avoid bad-faith liability by refusing to investigate a claim. However, I disagree that there is legally sufficient evidence in this case to support the jury's bad-faith finding, because there is no evidence that a reasonable insurer could not deny the Simmonses' claim based on the investigation State Farm

performed. Accordingly, I respectfully dissent.[1]

## I

This Court has struggled with the tort of bad faith. *See Universe Life Ins. Co. v. Giles,* 950 S.W.2d 48, 79–80 (Tex.1997) (Enoch, J., concurring). In attempting to "clarify" no evidence review of a bad-faith finding, the Court has recast the tort, abandoning the "no reasonable basis" standard and replacing it with a "liability has become reasonably clear" standard. *Id.* at 80. I continue to believe that this "change" is no change at all. *Id.* ("[T]his semantic recasting of the elements of bad faith in no way alters the character of proof necessary for a plaintiff to prevail, nor does it change the manner in which an appellate court ought to conduct a legal sufficiency review in a bad-faith case.").

Today's decision purports to turn on a different standard—that an insurer may breach the duty of good faith and fair dealing if it "investigat[es] a claim in a manner calculated to construct a pretextual basis for denial." 963 S.W.2d at 48. While I agree that an insurer has a duty to investigate its insureds' claims, this duty can form the basis of bad-faith liability only if the plaintiff presents evidence that the insurer's breach of this duty results in denial of a claim that no reasonable insurer could have denied. The problem with the Court's analysis is that it does not link the duty to investigate to the objective element of the bad-faith tort—whether the insurer's liability is reasonably clear. It is not enough that the investigation was "outcome-oriented," 963 S.W.2d at 45; there must be some evidence that a reasonable insurer could not have denied the claim, the particular insurer's subjective orientation notwithstanding. *See Republic Ins. Co. v. Stoker,* 903 S.W.2d 338, 340 (Tex.1995) (noting that first element of bad-faith test—whether a reasonable insurer under similar circumstances might deny the claim—requires an objective determination).[2]

## II

Such evidence simply is missing in this case. In their pleadings in this Court, the Simmonses do not dispute that a reasonable insurer could conclude that *someone* intentionally set fire to the Simmonses' home. Our no evidence review must consist of a search of the record for some evidence that State Farm could not have reasonably concluded that the Simmonses set the fire. Close analysis of the evidence cited by the Court reveals that there is no evidence that a reasonable insurer could not have denied the Simmonses' claim.

First, the Court points to evidence that "[t]he Simmonses' fire loss claim was immediately deemed 'suspicious' because of [an] earlier theft claim." 963 S.W.2d at 45. I fail to see how this constitutes evidence of bad faith. Surely insurers are not precluded from being "suspicious" of claims. In any event, the insurer's subjectively-held suspicions are irrelevant to the objective determination of whether a reasonable insurer could have denied the claim.

Second, the Court holds that State Farm's "fail[ure] to investigate the possibility that other potential suspects might have started the fire" is some evidence of bad faith. 963 S.W.2d at 45. What is missing, however, is some evidence that a reasonable insurer could not deny coverage without performing such an investigation. An aspirational statement by a State Farm representative that " 'it was important for [him] to do everything [he] could to get information with regard to th[e] claim before [he] made a final decision,' " 963 S.W.2d at 45 (quoting trial testimony), is no evidence that a reasonable insurer could not deny coverage without doing more.[3] The Court cites evidence that "State

---

1. Because I would hold that there is no evidence of bad faith, I concur in the Court's judgment that the Simmonses are not entitled to punitive damages. *See* 963 S.W.2d at 43.

2. Of course, the insurer's orientation in investigating is highly relevant to the subjective prong of bad faith—whether the insurer knew or should have known that liability was reasonably clear—

as well as to a punitive damages analysis. But an insurer's desire to deny a claim has no bearing on an objective analysis of whether a reasonable insurer could deny the claim.

3. Similarly, statements by State Farm representatives that "policyholders reasonably expect insurers to thoroughly and adequately investigate claims, to disclose material facts, and to give

Farm did not pursue [other suspects] because of the physical evidence; *i.e.*, the house was locked and there was no evidence of forced entry." 963 S.W.2d at 45. If a reasonable insurer could deny coverage on this basis, then there is no bad faith. In the absence of some evidence that no reasonable insurer could deny coverage for this reason, State Farm's failure to conduct further investigation of other suspects is no evidence of bad faith.

Finally, the Court states that the purported absence of six of eight "common indicators of insurance fraud by arson" is some evidence of bad faith. 963 S.W.2d at 46. First, there is no evidence indicating that a reasonable insurer could not deny a claim if six of these eight criteria are not met. What is the standard for a reasonable insurer? Is it these criteria alone, or are there others? Would denial of a claim be reasonable if four of the eight criteria are present? How about six? The absence of evidence of this character—linking these eight criteria to what a reasonable insurer might do—is fatal to a bad-faith claim.

Second, even as to the two criteria about which the Court acknowledges a dispute in the evidence, there is no evidence that a dispute over these criteria amounts to bad faith. For example, there was evidence that the Simmonses removed a lot of clothes from the home just shortly before the fire. However, there is no evidence that a reasonable insurer could not deny the Simmonses' claim in the face of a dispute about how much clothing was taken and how much was left behind. Moreover, when it denied the Simmonses' claim, State Farm had before it evidence that suggested that the Simmonses had such difficulty in making their mortgage payments that they had to strike a special deal with the Veterans Administration. There is no evidence that a reasonable insurer could not rely on this evidence in assessing the claim, nor is the fact that State Farm

policyholders the benefit of the doubt," and that "an adjuster should approach a policyholder to help resolve apparent conflicts," 963 S.W.2d at 46, are no evidence that a reasonable insurer could not deny coverage based on the investigation State Farm actually performed. These aspirational statements do not establish legal standards of reasonableness. Otherwise, an insurer

was mistaken as to the exact structure of the mortgage payments evidence of bad faith. *See Stoker*, 903 S.W.2d at 340 (stating that objective prong of bad-faith test "assures that a carrier 'will not be subject to liability for an erroneous denial of a claim,' as long as a reasonable basis for denial of the claim exists") (quoting *Aranda v. Insurance Co. of N. Am.*, 748 S.W.2d 210, 213 (Tex.1988) (citation omitted)).

### III

An insurer's duty to investigate claims arises from, and must be construed in light of, its duty to pay claims when liability is reasonably clear. Bad-faith liability can exist only when there is some evidence that a reasonable insurer could not have denied the claim. A breach of the duty to investigate should give rise to bad-faith liability only when there is evidence connecting that breach to the conclusion that a reasonable insurer could not have denied the claim. Because there is no such evidence in this case, I respectfully dissent.

could not deny a claim when there is a bona fide dispute about coverage without incurring bad-faith liability. Indeed, the Court acknowledges in this case that "[e]vidence establishing only a bona fide coverage dispute does not demonstrate bad faith." 963 S.W.2d at 44 (citing *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 17 (Tex. 1994)).