Opinion issued May 10, 2007










 






In The

Court of Appeals

For The

First District of Texas






NO. 01-06-00459-CV






KONSTANTINOS ROUTIS; DULUTH RESTAURANTS, INC.; AND/OR
KRMG ENTERPRISES, INC. AS THE ATTORNEY IN FACT OF DULUTH
RESTAURANTS, INC., Appellants


V.


CLARENDON AMERICA INSURANCE COMPANY, INC., Appellee






On Appeal from the 280th District Court

Harris County, Texas

Trial Court Cause No. 2004-65367






MEMORANDUM OPINION


 Appellants, Konstantinos Routis ("Routis"), Duluth Restaurants, Inc., (1) and/or
KRMG Enterprises Inc., as attorney in fact of Duluth Restaurants, Inc. ("KRMG"),
sued appellee, Clarendon America Insurance Company, Inc., for breach of contract
after appellants' building was destroyed by fire and appellee denied coverage. The
trial court rendered a take-nothing judgment against appellants.

 In two issues, appellants (1) challenge the legal and factual sufficiency of the
evidence supporting the trial court's judgment and (2) contend that the trial court
applied an incorrect standard of proof.

 We affirm.

Summary of Facts and Procedural History

 Routis, a citizen of Greece who came to the United States in 1975, asserts that
he does not speak English and does not read or write in any language. In 1991,
Routis's nephew, Sachtouris Routis, moved to the United States and began
overseeing Routis's business matters. 

 In 1985, Routis purchased a nightclub business, known as "La Chatte," located
at 13335 Duluth in Houston. In 1989, he created KRMG corporation and purchased
the building and land at 13335 Duluth. In 1992, a fire caused extensive damage to
the building. The Houston Fire Department determined that an arsonist had poured
gasoline through a rooftop air conditioner, but there was never a conviction in the
case. Routis received $350,000 in insurance proceeds, and Sachtouris supervised the
reconstruction of the building.

 On August 15, 2000, KRMG sold the personal property assets of La Chatte to 
Duluth Restaurants, Inc. ("Duluth") for $350,000. The asset purchase agreement was
executed by Routis, on behalf of KRMG, and by Louis Servos, as president of
Duluth. 

 In addition, Routis, individually, executed a lease of the La Chatte real property
to Duluth. The lease was for a period of five years and for an aggregate sum of
$354,000, payable in variable monthly installments. The lease provided as follows
in pertinent part:

 10.2 Tenant shall procure and maintain throughout the term of this
Lease a policy or policies of insurance, at Tenant's sole cost and
expense, insuring Landlord as well as Tenant from all claims, demands,
or actions arising out of Tenant's use and occupancy of the leased
premises. The property damage insurance shall have limits of liability
of not less than $1,250,000.00, . . . . In addition, Tenant will procure
and maintain throughout the term of this Lease a policy or policies of
fire and extended coverage insurance at Tenant's sole cost and expense
on the building, fixtures, equipment, constituting the leased premises,
insuring all such property for its full value. All insurance shall be
carried with companies satisfactory to Landlord.

 . . . . 

 14.2 In the event that the leased premises are damaged or destroyed by
fire or other casualty insurable under standard fire and extended
coverage insurance and Landlord does not elect to terminate this Lease
. . . , Landlord shall proceed with reasonable diligence and at its sole
cost and expense to rebuild and repair the leased premises. If the leased
premises are damaged or destroyed by fire or other casualty so as to
render untenantable more than 50% of the floor area of the entire
building in which the leased premises are located, Landlord may elect
either to terminate this Lease or to proceed to rebuild and repair the
leased premises. Landlord shall give written notice to Tenant of its
election within sixty (60) days after the occurrence of the casualty and,
if it elects to rebuild and repair, shall proceed to do so with reasonable
diligence and at its sole cost and expense.

 . . . . 

 14.5 Any insurance against casualty loss which may be carried by either
Landlord or Tenant shall be under the sole control of the party carrying
the insurance, and the other party shall have no interest in any proceeds
of that insurance. 

 The Lease also granted Duluth an exclusive right to purchase "the Leased
Premises" during the primary term of the Lease for $550,000, and provided that
Routis would finance the purchase. 

 In February 2002, Servos transferred his interest in the nightclub to Gus
Venetoulias. In November 2002, Venitoulias transferred his interest to Mario Jafari,
who operated the nightclub as "Duluth Restaurants, Inc., d/b/a Island Cabaret." Jafari
understood that his interest was governed by the original asset purchase agreement
between KRMG and Duluth, and by the real-property lease between Routis and
Duluth. Each month, Routis accepted Jafari's payments. 

 At the time Jafari purchased the club, it had been grossing $20,000-$30,000
in revenues each month. Over time, Jafari began to realize revenues of
$40,000-$50,000 per month. According to Jafari, Routis approached him at one
point about exchanging the club for another of Routis's clubs in Houston. Jafari
declined the offer.

 In June 2003, according to Jafari, Jafari was contacted by Routis's insurance
carrier and was told that it was time to renew the insurance policy covering the
property and business. Jafari executed the paperwork and paid the premium. 
According to Routis and Sachtouris, however, the agent contacted them in July, 2003,
and said that the insurance on the building was in danger of lapsing because Jafari
had not paid the premium. According to Sachtoris, Sachtouris sent a copy of the lease
to the agent, told the agent to issue the policy, and paid the premium. 

 The record shows that appellee issued an insurance policy ("Policy"), effective
July 19, 2003. The Policy listed as the named insured "Duluth Restaurants, Inc.,
DBA Island Cabaret" at 13335 Duluth, and it listed Routis and Sachtouris each as an
"additional insured," with proceeds for losses to be paid directly to "Routis and
Sachtouris Routis." The coverage amount was increased $200,000 on the building,
and the loss of business income coverage was dropped. Routis and Sachtouris deny
that they instructed the agent to alter the coverage limits.

 At 2:00 a.m. on August 10, 2003, Routis was closing up for the night at his
nightclub, Mango's. Sachtouris, who managed Mango's, was there tallying the
registers. The men finished cleaning up at 4:00 a.m., and Routis went home. 
Sachtouris went to a friend's nightclub. At 6:30 a.m., Sachtouris received a call that
the building at 13335 Duluth was on fire. 

 The fire department arrived within minutes. All the exterior doors were
covered by burglar bars and locked. The fire department had to cut through the locks
to gain entry. The building suffered extensive damage. 

 At the time of the fire, the building was protected by a security system that
monitored ingress and egress from exterior doors. System records from the night of
the fire indicated that the building had been armed at 2:36 a.m. and that no doors had
been opened before a fire was detected in the VIP Room at 6:20 a.m.

 Throughout the lease period, Routis had maintained exclusive possession of
two small rooms at the back of the building--a storage room and a "workout room"
that contained gym equipment. These rooms were not wired into the building's alarm
system. The storage room had an exterior door that was protected by burglar bars, and
Routis had the only known set of keys. The storage room shared a common wall with
the VIP Room.

 Preliminary investigations determined that the fire had two points of
origin--one in Routis's storage room and one in the VIP Room--and that the fire was
incendiary. Houston Fire Department arson investigator S. Merrel testified that he
determined that the fire was deliberately set and that whoever set the fire had access
to the storage room at the back of the building because the alarm system had not been
shut off or tampered with. B. Koger, an independent fire investigator, brought in a
combustible gas detector and detected that flammable liquids had been used. T. Petty,
of the Harris County Fire Marshal's Office, who brought in an accelerant-detection
dog, which alerted in the VIP Room. However, laboratory samples taken tested
negative for flammable liquids.

 Subsequent to the fire, appellants changed the locks on the building. Jafari, as
Duluth, sent a letter of notification to Routis that Duluth would formally exercise its
option to purchase the building. Appellants refused Jafari's August rental payment
and terminated the lease, citing the Lease provision that permitted termination if the
building became over 50 percent damaged by fire. Jafari argued that the damage was
less than 50 percent. In October 2003, while appellants had sole access to the
building, another fire occurred that caused additional damage to the interior of the
building. The parties do not dispute that the building was then over 50 percent
damaged. 

 Jafari, as Duluth Restaurants, filed a sworn proof of loss for its share of the
insurance proceeds and appellee paid $12,722 on the claim. Subsequently, appellants
also filed claims of approximately $600,000 in damages with appellee in the name of
Duluth, which appellee denied. Appellants then sued appellee, alleging breach of the
insurance contract and violations of the Insurance Code and Texas Deceptive Trade
Practices Act. Appellee asserted the defenses of fraud and illegality on the grounds
that the Policy specifically excluded coverage for losses caused by any fraudulent,
dishonest, or criminal act done by or at the instigation of any insured, which, it
alleged, had occurred here. In addition, appellee asserted the defenses of payment,
release, satisfaction, estoppel, and waiver on the grounds that Jafari's claim in the
name of Duluth was proper and had been paid. Appellee contended that Duluth was
an entity separate from appellants and that appellants lacked capacity to bring a claim
in the name of Duluth. Further, appellee contended that KRMG was neither an
insured nor a loss payee under the Policy. (2)

 On December 19, 2005, the case was tried without a jury. (3) At the conclusion
of trial, the trial court announced that it found that the loss in question was the result
of an arson committed by appellants. On February 24, 2006, the trial court rendered
a take-nothing judgment against appellants.

 On March 24, 2006, appellants filed a motion for new trial, which the trial
court denied. On May 16, 2006, the trial court denied appellants' motion to
reconsider the motion for new trial. On May 24, 2006, appellants filed an untimely
request for findings of fact and conclusions of law. (4) No findings of fact or
conclusions of law appear in the record.Sufficiency of the Evidence

 In their first and second issues, appellants (1) challenge the legal and factual
sufficiency of the evidence supporting the trial court's judgment and (2) contend that
the trial court applied an incorrect standard of proof. These issues can be most
succinctly addressed together in a single analysis.

A. Standard of Review and Applicable Law

 In a non-jury trial, when findings of fact and conclusions of law are not
properly requested and none are issued, all facts necessary to support the judgment
and supported by the evidence are implied. See Sixth RMA Partners, L.P. v. Sibley,
111 S.W.3d 46, 52 (Tex. 2003); Wade v. Comm'n for Lawyer Discipline, 961 S.W.2d
366, 374 (Tex.App.--Houston [1st Dist.] 1997, no pet.). When, however, as here, the
record contains the clerk's and reporter's records, these implied findings are not
conclusive and may be challenged for legal and factual sufficiency. See BMC
Software Belg., N.V. v. Marchand, 83 S.W.3d 789, 795 (Tex. 2002). We apply the
same standards of review that are applied in reviewing evidence supporting a jury's
answer. Catalina v. Blasdel, 881 S.W.2d 295, 297 (Tex. 1994).

 In conducting a legal sufficiency review, we consider "whether the evidence
at trial would enable reasonable and fair-minded people to reach the verdict under
review." City of Keller v. Wilson, 168 S.W.3d 802, 827 (Tex. 2005). We "credit
favorable evidence if reasonable jurors could, and disregard contrary evidence unless
reasonable jurors could not." Id. As long as the evidence falls within the zone of
reasonable disagreement, we may not substitute our judgment for that of the fact-finder, which alone determines the credibility of the witnesses and the weight, if any,
to be given their testimony. Id. at 819, 822. We review the evidence in the light most
favorable to the verdict and indulge every reasonable inference that supports it. Id.
at 822. However, we may not disregard evidence that allows only one inference. Id. 
We will sustain a legal sufficiency challenge if the record shows one of the following:
(1) a complete absence of evidence of a vital fact; (2) rules of law or evidence bar the
court from giving weight to the only evidence offered to prove a vital fact; (3) the
evidence offered to prove a vital fact is no more than a scintilla; or (4) the evidence
establishes conclusively the opposite of the vital fact. Id. at 810.

 Under the factual sufficiency standard, we consider all the evidence in the
record, both supporting and conflicting, and set aside the verdict only if it is so
contrary to the overwhelming weight and preponderance of the evidence that it is
clearly wrong and manifestly unjust. Plas-Tex Inc. v. U.S. Steel Corp., 772 S.W.2d
442, 445 (Tex. 1989); Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986). In an appeal
from a bench trial, we do not invade the fact-finding role of the trial court, which
alone determines the credibility of the witnesses, the weight to give their testimony,
and whether to accept or reject all or any part of that testimony. Nordstrom v.
Nordstrom, 965 S.W.2d 575, 580-81 (Tex.App.--Houston [1st Dist.] 1997, pet.
denied).

B. The Law

 An insured seeking recovery under an insurance policy must prove the
contractual provisions that allow recovery. Texas Farmers Ins. Co. v. Murphy, 996
S.W.2d 873, 879 (Tex. 1999). "If there are any contractual provisions that could limit
or bar recovery, it is incumbent upon the insurer to plead and prove them." Id. 

 Arson is an affirmative defense to a civil suit for insurance proceeds. State
Farm Fire & Cas. Co. v. Simmons, 963 S.W.2d 42, 45 n.1 (Tex. 1998). To establish
arson, an insurer bears the burden of proving that the insured set the fire or caused it
to be set. Murphy v. Texas Farmers Ins. Co., 982 S.W.2d 79, 84 (Tex.
App.--Houston [1st Dist.] 1998), aff'd on other grounds, 996 S.W.2d 873 (Tex.
1999); State Farm Lloyds, Inc. v. Polasek, 847 S.W.2d 279, 282 (Tex. App.--San
Antonio 1992, writ denied). However, the insured's burden of proof is not to show
by an absolute certainty, but rather, by a preponderance of the evidence that the
insured set the fire. Murphy, 982 S.W.2d at 84. Because arson is ordinarily
committed in secrecy, it may be proved by circumstantial evidence. Id. To establish
the affirmative defense of arson, the insurer must show that (1) the fire had an
incendiary origin; (2) the insured had a motive to set the fire or cause it to be set; and
(3) the insured had an opportunity to set the fire or other circumstances link the
insured to the fire. Simmons, 963 S.W.2d at 45 n.1; Murphy, 982 S.W.2d at 84. 

C. Analysis 

 Here, the record shows that an insurance policy was in existence at the time
that the August 10, 2003 fire occurred. Specifically, the record shows that, on June
9, 2003, Jafari, as Duluth Restaurants, Inc., dba Island Cabaret, executed a
commercial insurance application ("Application") with King-Phillips Insurance
Agency and that Jafari wrote a check to King-Phillips for $3,712.15 on July 18, 2003,
which King-Phillips cashed on July 23, 2003. The Application states that the
proposed coverage period was July 19, 2003 to July 19, 2004, and Routis and
Sachtouris were listed as additional payees. The record shows that appellee then
issued the Policy, to be effective from July 19, 2003 to July 19, 2004. The Policy
listed as the named insured "Duluth Restaurants, Inc., DBA Island Cabaret" at 13335
Duluth, and listed Routis and Sachtouris as "additional insured," with proceeds for
losses to be paid directly to "Routis and Sachtouris Routis." 

 On August 10, 2003, a fire destroyed the building at 13335 Duluth. The Policy
included coverage for damage to the building and contents caused by fire. Appellants
contend that they made a proper and timely claim to appellee and that appellee
breached the insurance contract by failing to pay as agreed for the losses sustained.
Appellee asserted the defense of arson, contending that appellants deliberately set the 

fire that caused damage to the covered building and that the Policy specifically
excluded coverage under these circumstances. The record shows that the Policy
excluded, inter alia, coverage for loss, damage, or expense of any nature in any way
connected with "[a]ny fraudulent, dishonest, or criminal act done by or at the
instigation of any insured, partner or joint venture participant in or of any insured, an
officer, director or trustee of any insured. . . ." 

 At the close of trial, the trial court stated in the record that it concluded that the
fire was a result of arson and that the arson was committed by appellants. On appeal,
appellants do not challenge the finding that arson occurred; rather, they contend that
there is no evidence that Routis directly or indirectly caused the fire.

 Here, to establish the affirmative defense of arson, appellee was required to
show evidence that (1) the fire had an incendiary origin; (2) appellants had a motive
to set the fire or cause it to be set; and (3) appellants had an opportunity to set the fire
or other circumstances existed linking them to the fire. See Simmons, 963 S.W.2d at
45 n.1; Murphy, 982 S.W.2d at 84. Appellee had the burden to prove by a
preponderance of the evidence that appellants set the fire or caused it to be set. 
Murphy, 982 S.W.2d at 84; Polasek, 847 S.W.2d at 282. 

 1. Incendiary Origin

 Appellants concede that the fire had an incendiary origin; however, appellants
contend that the evidence does not show that they set the fire. The record shows that
R. Gonzales, a junior captain of the Houston Fire Department who responded to the
fire, testified that he participated in cutting through a locked storage room door, later
identified as Routis's, and that he extinguished a fire in the storage room. Gonzales
testified that the storage room was a point of origin of the fire. Gonzales also testified
that the storage room had a wall in common with the VIP Room. 

 T. Gardiner, District Chief of the Houston Fire Department, brought in
preliminary investigators who determined that there were two separate points of
origin--one in Routis's storage room and one in the VIP Room. Gardiner turned the
investigation over to Houston Fire Department arson investigator S. Merrel.

 Merrel testified by deposition that all of the exterior doors of the building,
including the door to Routis's storage room, were behind locked burglar bars that had
to be cut through for the fire department to gain entry. In addition, Merrel testified
that all of the doors to the building were on an alarm system except the doors to
Routis's storage room and workout room. Merrel testified that system records
indicated that the building alarm was activated when the club closed at 2:36 a.m. and
that none of the alarms detected movement in the building prior to the fire. Merrel
testified that whoever set the fire had access to the storage room at the back of the
building. Routis and Sachtouris had testified that Routis had the only key to the
storage room door. Further, Merrel testified that it was his opinion that the fire that
began in the VIP room was a result of someone having entered the storage room,
having lifted up ceiling tiles, and having either crawled over the wall or thrown
something into the VIP Room.

 B. Koger, an independent fire investigator, testified that the wall between
Routis's storage room and the VIP Room did not go all the way to the ceiling and that
it was possible to pull aside the tiles of the dropped ceiling, where there was a two-foot crawl space over the wall. Koger testified that he had concluded that someone
had entered through Routis's storage room with a ladder and had thrown a
combustible liquid into the VIP Room. Koger brought in a combustible gas detector
which detected that flammable liquids had been used. This conclusion was supported
by the testimony of T. Petty, of the Harris County Fire Marshal's Office, who brought
in an accelerant-detection dog which alerted in the VIP Room. 

 From this evidence, the trial court could have reasonably concluded that Routis
and/or Sachtouris set the building on fire or caused it to be set on fire. See Polasek,
847 S.W.2d at 283. 

 Appellants contend that the samples of material that were sent to the laboratory
tested negative for the presence of accelerants. In addition, appellants contend that
they were never charged with having committed arson. We do not invade the
fact-finding role of the trial court, who alone determines the credibility of the
witnesses, the weight to give their testimony, and whether to accept or reject all or
any part of that testimony. See Nordstrom, 965 S.W.2d at 580-81.

 2. Motive

 We next examine the record for evidence showing that Routis had a motive to
set the building on fire. First, the record shows that less than 30 days prior to the
fire, the insurance coverage on the building was raised from $300,000 to $500,000. 
At the same time, the business interruption coverage protecting Duluth was
dropped--suggesting that the coverage changes were not instigated by Jafari. 
Appellee maintains that appellants intervened at the time of the renewal and ordered
the changes. Appellants deny that they gave any such instructions.

 Second, the record reveals evidence that appellants were experiencing financial
distress at the time of the fire. Routis's bank records show that there was $187 in his
account on July 11, 2003 and that the account had incurred overdraft charges. See
Vandiver, 970 S.W.2d at 737 (finding evidence of motive when bank records revealed
low balance and insufficient funds charges near time of fire). 

 From this evidence, the trial court could have reasonably concluded that Routis
had a motive to set the building on fire or to cause it to be set on fire. See id.;
Polasek, 847 S.W.2d at 283.

 At trial, appellants disputed that they were experiencing financial difficulties
at the time of the fire. Sachtouris testified that he and Routis had $500,000 in another
account and had purchased other clubs, but appellants did not produce any evidence. 
We defer to the trial court's determination with regard to the weight, if any, to be
placed on this testimony. See Nordstrom, 965 S.W.2d at 580-81.

 3. Opportunity 

 Finally, we examine the record for any probative evidence tending to show that
appellants had an opportunity to set the fire that occurred at the building. 

 The record shows that, at 4:00 a.m., on the night of the fire, Routis allegedly
went home after closing up his nightclub, Mango's, and Sachtouris allegedly went to
a friend's nightclub. There was no evidence corroborating their whereabouts. See
Murphy, 982 S.W.2d at 84 (considering lack of evidence corroborating whereabouts
on night of fire). At 6:20 a.m., the alarm system at 13335 Duluth detected a fire at the
rear of the club in the "VIP Room." All the doors of the building were monitored by
a security system except the two small rooms at the back of the building. Routis had
exclusive access to those small rooms; however, Sachtouris testified that Routis
sometimes loaned him the keys. These two rooms were not wired into the security
system. There were no breaches of security detected on any of the doors of the club
prior to the fire alarm. A fire started in Routis's storage room and a separate fire
began in the VIP Room, which shared a common wall with Routis's storage room. 
The record showed that the ceiling tiles could easily be removed, giving access over
the wall to the VIP Room. These facts constitute evidence of opportunity. See
Vandiver, 970 S.W.2d at 737 (finding evidence of opportunity when burned structure
was locked and accused had only set of keys); Polasek, 847 S.W.2d at 282. 

 We conclude that the combined evidence falls within the zone of reasonable
disagreement and supports the trial court's implied finding that Routis and/or
Sachtouris set the building on fire and that therefore appellee's proffered exclusion
from coverage applies. See Wilson, 168 S.W.3d at 827; Vandiver, 970 S.W.2d at 737.
We hold that the evidence is legally sufficient because the evidence would enable
reasonable and fair-minded people to reach the verdict under review. See Wilson, 168
S.W.3d at 827. In addition, we hold that the evidence is factually sufficient because,
after considering all the evidence in the record, the verdict is not so contrary to the
overwhelming weight and preponderance of the evidence that it is clearly wrong and
manifestly unjust. See Plas-Tex Inc., 772 S.W.2d at 445; Cain, 709 S.W.2d at 176. 
We further hold that the trial court applied the proper standard of proof when it
concluded by a preponderance of the evidence that appellee met its burden to show
that an exclusion to coverage applied in this case. See Murphy, 996 S.W.2d at 879.

 Accordingly, appellants' first and second issues are overruled.

Conclusion

 We affirm the judgment of the trial court.

 




 Laura Carter Higley

 Justice


Panel consists of Justices Nuchia, Keyes, and Higley.

1. 
 
2. "
 
 " 
 
3. 
 
4.