Charles L. BRACEWELL, Appellant,

v.

W.T. BRACEWELL and Laurie Louise Knight, Temporary Administrator of the Estate of Irene L. Bracewell, Deceased, Appellees.

No. 01–96–01492–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Nov. 4, 1999.

Opinion Overruling rehearing and En Banc Reconsideration Nov. 16, 2000.

Daryl L. Moore, Houston, for Appellant.

Kenneth H. Keeling, Huntsville, for Appellee.

Panel consists of Chief Justice SCHNEIDER and Justices WILSON and ANDELL.

## OPINION

DAVIE L. WILSON, Justice.

In what may be a case of first impression, we review the operation of Texas Rule of Evidence 105(b)'s waiver provision in a situation in which a general objection becomes a specific objection before the trial court rules. Appellees (1) W.T. Bracewell (the father) and (2) Laurie Louise Knight, temporary administrator of the estate of Irene L. Bracewell (the moth-er), deceased, successfully sued appellant Charles L. Bracewell (the son) to recover title to two tracts of land based on theories of fraud and constructive trust. The son appeals with two points of error. We affirm.

## Facts

The mother and father had two children—a daughter, Bobbie, and the son. The mother and father owned approximately 800 acres of land acquired in various parcels during their lifetime. By 1982, they had conveyed some 597 acres of the total to their children in approximately equal shares. They reserved life estates, but later released them. The remaining acres not conveyed were the couple's homestead. They executed joint wills in 1975, each naming the other as primary beneficiaries with the children as contingent beneficiaries. The mother was diagnosed with Parkinson's disease in 1984.

In May 1986, the mother and father conveyed 160 acres of their homestead to the son. In March 1987, the mother and father conveyed the remaining 56 acres of their homestead to the son. Unlike previous conveyances, the two deeds did not contain a reservation of any life estate. The two final deeds were prepared by the son, whereas the former deeds had been prepared by the father or under his direction.

In 1989, the son and the mother discovered that the father had executed a holographic will. The mother then executed (1) a new will that named the son as her primary beneficiary and (2) a power of attorney designating the son as her attorney in fact. The mother also executed a July 12, 1989 affidavit in which she stated that she and the father had voluntarily given various tracts of land to the son—including the May 1986 and March 1987 conveyances of 216 acres of homestead—as gifts.

The mother was placed in a nursing home in the early 1990s. In 1994, the

father and daughter attempted to get the mother to execute a relinquishment of retained mineral rights to property previously conveyed to the daughter. The son then informed the father and daughter about the 1989 power of attorney. As a result of the escalating conflict, the son attempted to evict the father from the father's home on the 216 acres of homestead previously conveyed to the son. The father then filed this lawsuit, seeking to recover title to the homestead based on theories of fraud and constructive trust. The jury found for the father on both theories.

## Discussion

### *Exclusion of the affidavit*

In point of error one, the son contends the trial court erred in excluding the mother's 1989 affidavit. We review a trial court's evidentiary rulings on an abuse-of-discretion basis. *Lyondell Petrochemical Co. v. Fluor Daniel, Inc.,* 888 S.W.2d 547, 550 (Tex.App.—Houston [1st Dist.] 1994, writ denied).

In pertinent part, the affidavit states:

After the first gift deed was signed by us and delivered to [our son], we executed and delivered other deeds to our son. . . . Those other deeds are as follows:

. . . .

(4) Deed dated May 30, 1986 . . .;

(5) Deed dated March 18, 1987. . . .

Though each of these later deeds showed on its fact [sic] that the consideration was TEN AND NO/100 DOLLARS ($10.00) cash, the real consideration for the execution of each was the love and affection my husband and I had at the time for our son. . . . We gave the land described in those deeds to [our son] because we loved [him] and we wanted him to have [our] house and land for him to make a living in the future on his cows and the lake.

I still love my son and want him to have the land we have given him. He has been a great help to me and to my husband over the years by working on and around the ranch, including bailing [sic] and hauling hay, maintaining pastures and fences and working cattle. He has helped take care of me personally, especially in the past several years. I am by this Affidavit confirming the gifts previously made to my son as set out above, and also to confirm that the consideration for these conveyances was the love and affection both my husband . . . and I held for our son. . . . I do this in hopes to set the record straight and to prevent anyone from claiming that [my son] in any way took advantage of me or [my husband]. We knew full well what we were doing when we signed each deed, and that we were giving to him the land described in each deed because we loved our son. I deeply regret the fact that anyone would believe that we did not intend to give [our son] the land or that [he] in some way took advantage of us in obtaining the land. I want him to have it, and I wanted him to have it when I signed each deed.

Appellees objected to the introduction of the affidavit as hearsay and alleged the affidavit was barred by the "Dead Man's Rule." *See* Tex.R. Evid. 601(b) (prohibiting use of uncorroborated oral statements by testator, intestate, or ward). The trial court excluded the affidavit.

There was a great deal of discussion at trial about whether to admit the affidavit. No one argues on appeal that the affidavit was properly excluded under the "Dead Man's Rule"; it clearly was not. Additionally, no one argues that as to the mother the affidavit was an admission by a party-opponent—and therefore not hearsay—since the mother's estate is adverse in this lawsuit to the son. *See* Tex.R. Evid. 801(e)(2). Appellees proceed to argue that to the extent the mother attempted to speak for the *father* in the affidavit, *e.g.,* "[W]e were giving to him the land described in each deed because we loved our

son," the affidavit is not admissible as an admission by a party-opponent against the father.

■ Appellees focus their argument on appeal on waiver. Appellees claim that the son's failure, in the trial court, to limit his offer of the affidavit only to the mother precludes him from appealing the trial court's ruling excluding the affidavit. *See* Tex.R. Evid. 105(b) ("When evidence referred to in paragraph (a) is excluded, such exclusion shall not be a ground for complaint on appeal unless the proponent expressly offers the evidence for its limited, admissible purpose or limits its offer to the party against whom it is admissible.").[1]

At first blush, appellees make a convincing argument. Appellees made a general hearsay objection at trial, which on its surface included an objection to the double hearsay inherent in the affidavit, *i.e.*, the mother's statement about the father's intent in conveying the land. If the trial court had sustained appellees' general hearsay objection without comment or argument from counsel, Texas Rule of Evidence 105(b) would in fact prohibit the son from complaining on appeal if he did not limit his offer of the affidavit to just the mother's intent. *See Perry v. Texas Mun. Power Agency*, 667 S.W.2d 259, 265 (Tex. App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.) (duty of party offering evidence to segregate admissible from inadmissible evidence inferred from court of appeals' statement that it is not trial court's or objecting party's duty to so segregate). We conclude, however, that appellees' objection was not a general one.

In order to preserve for appeal a complaint about the erroneous exclusion of evidence, Texas Rule of Evidence 103(a)(1) requires a party to make a specific ground of objection, unless the specific ground was apparent from the context. Reviewing the reporter's record, it is readily apparent that appellees' objection at trial was specif-

ic to (1) the mother's hearsay statements in the affidavit, which appellees argued were not an admission by a party-opponent, and (2) appellees' contention that the affidavit was excluded by the "Dead Man's Rule." If the trial court had overruled appellees' objection, we would certainly conclude that appellees' grounds of objection would have been specific enough to preserve error under rule 103(a)(1).

■ We must interpret rules 103(a)(1) and 105(b) in conjunction with one another. If the trial court sustains a *general* objection to evidence that is both admissible in part and inadmissible in part, the proponent of the evidence must properly limit his offer to the admissible evidence in order to preserve a complaint on appeal. Tex.R. Evid. 105(b). However, if (1) the ground of objection is (a) *specific* or (b) *apparent from the context* and (2) the trial court sustains that specific or apparent objection, then the proponent of the evidence need not limit his offer to "respond" to valid objections that the opponents either did not make or abandoned.

It would make no sense to allow the opponents of evidence to specifically or apparently limit their general objection—thus, abandoning potentially valid grounds of objection—and then require the proponent of the evidence to limit his offer to both the valid specific/apparent objections *and* the valid abandoned objections. If we were to allow this, we would be encouraging parties to make specific grounds of objection at trial and then lie behind the log of rule 105(b) to prevent appellate review. Since the purpose of the rules of evidence is to promote fairness and to ascertain the truth, rather than to promote gamesmanship, we decline to interpret rule 105(b) in a way that requires a proponent of evidence to limit his offer based on a ground that his opponents have already abandoned. *See* Tex.R. Evid. 102.

---

1. Appellees argued in the trial court that as to the mother, the affidavit was not an admis-

sion by a party-opponent. Appellees have abandoned that argument on appeal.

■ Appellees next argue that even if the son's complaint is not waived under rule 105(b), then the trial court nonetheless did not abuse its discretion in excluding the affidavit because the probative value of the affidavit was substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence. *See* TEX.R. EVID. 403. Appellees, however, only briefly mentioned this objection at trial, did not obtain a ruling, and thereby waived it. *See* TEX.R.APP. P. 33.1(a).

Based on the objections raised at trial by the appellees on which the trial court ruled, we hold that the trial court abused its discretion in excluding the affidavit relative to the mother's intent and that the son has not waived his right to complain on appeal.

■ We must now determine whether the exclusion of the evidence was reversible error. *See* TEX.R.APP. P. 44.1(a) ("No judgment may be reversed on appeal on the ground that the trial court made an error of law unless the court of appeals concludes that the error complained of: (1) probably caused the rendition of an improper judgment...."). A person seeking to reverse a judgment based on evidentiary error need not prove that but for the error a different judgment would necessarily have been rendered, but only that the error probably resulted in an improper judgment. *City of Brownsville v. Alvarado,* 897 S.W.2d 750, 753 (Tex.1995). A successful challenge to evidentiary rulings usually requires the complaining party to show that the judgment turns on the particular evidence excluded or admitted. *Id.,* 897 S.W.2d at 753–54. We conduct our review to determine whether the error was reversible by examining the entire record, focusing on how the evidence erroneously admitted or excluded would have influenced the trier of fact. *Id.* at 754.

The trial was centered upon the simplest of assertions. The father claimed he and the mother executed the deeds transferring the homestead to the son based on the son's promise to assist them in managing and coping with the inevitable difficulties of the final years of life. The son denied any such promise was made, asserting the deeds were a gift with no strings attached. The jury heard and measured both father and son as they testified to this fundamental issue.

The jury also heard testimony from Linda Gressett, the father's granddaughter and the son's niece. Gressett testified that while visiting the son in Colorado, they had a conversation about the father and mother's homestead:

> I was sitting, talking to Charles, ... admiring the beautiful scenery.... It was just picturesque, and I said, do you ever intend to move permanently up here, and he told me yes, he planned on selling out in Bedias and moving up there one day, and I said oh, you'd sell your house in Bedias, and he said, ["]I'll sell both houses in Bedias,["] and I didn't know what he was talking about, and I said, both houses, what do you mean, and he said well, ["]my home and my parents' home,["] and I said, oh, they're going to leave you the home in their will, and he said, ["]the home and the land have been placed, the title has been placed in my name,["] and I said, while they're still alive, and he said, ["]yes,["] and I said, why would they do that while they're still living, and he said, ["]well, we had an agreement, and.... I told them that I would provide care and assistance for them, and I would help them as I was needed, and in exchange, they would put the title to the land in my name["].... I said that just doesn't sound like my grandparents, I'm surprised they would do that while they're living, and he said, ["]the old man trusts me,["]....

The jury also heard testimony from several witnesses about how the son had unsuccessfully attempted in the justice of the peace court to evict the father from the disputed homestead. Gressett was present at the forcible-entry-and-detainer proceeding and recalled the son being asked what the father would do if evicted. Gressett told the jury the son felt that "it wasn't his problem. He didn't care...." Gressett also recalled the son saying, "[L]et him [the father] go live with somebody that cares about him." Constable Larry Adams, the bailiff in the justice of the peace court, had a similar recollection of the son's testimony.

The lawsuit put the son in the difficult position of having to prove a negative—that he had made no promise to the parents in exchange for the deeds to the homestead. The son's defense was founded on the generally accepted fact that the father favored the daughter and the mother favored the son. The son asserted that when the mother's health began to slip, the father tried to take advantage of this to the son's detriment. The mineral rights to the various parcels of property had become valuable, and the son claimed the father sought to exclude him from various benefits resulting from leasing the mineral rights and skew the returns to the sister. When the son asserted himself through the power of attorney given to him by the mother, the father retaliated by filing this lawsuit based on a false assertion of a promise from the son to assist the parents in their declining years. The son also related several instances of the father's propensity to violence toward him involving various threats and physical confrontations that included the exhibition of knifes and firearms. The son attempted to convince the jury of the father's general bad faith and character by describing various incidents that occurred on the land in the presence of other people.

We must decide whether the introduction of the affidavit would have influenced the jury's verdict. Making this determination more difficult is the consideration of the evidence that would have inevitably accompanied the introduction of the affidavit. The evidence taken outside the presence of the jury indicated that the affidavit had been prepared by a lawyer paid by the son. The lawyer had no independent recollection of meeting the mother, but he recalled being visited by the son and the son's maternal aunt. The affidavit itself, which was executed in 1989, contains no direct denial of any promise made by the son to the parents, but does say that the mother's intent was to make a gift. The son testified he did not know until the lawsuit was filed in 1995 that the father claimed the son promised to support both parents.

The son claimed the mother had prepared a new will in 1989 in response to the discovery of the father's handwritten will, which replaced the father's portion of a 1975 joint will. There is an unchallenged assertion in appellees' brief that a subsequent contest to the mother's 1989 will occurred in which the mother was found to be incompetent. Therefore, the introduction of the affidavit would have been surrounded by issues of the mother's competency and the son's influence in directing the affidavit's wording and preparation. We cannot conclude that the affidavit would have been determinative of the outcome of the case, and we hold that the error did not cause the rendition of an improper judgment. Accordingly, the trial court's refusal to admit the affidavit was not reversible error.

We overrule point of error one.

### Jury charge

■ In point of error two, the son contends the trial court erred in not submitting a broad-form charge on questions 3 and 4.[2] *See* TEX.R. CIV. P. 277("In all jury

---

**2.** It is ironic that the son brings a complaint about the granulation of jury questions. In

all, the trial court submitted a charge contain-

cases the court shall, whenever feasible, submit the cause upon broad-form questions."); *Texas Dep't of Human Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex.1990). The following questions were submitted to the jury:

*JURY QUESTION 3:*

Do you find from a preponderance of the evidence that W.T. Bracewell and Irene L. Bracewell placed the title to the 160 acre tract in the name of Charles L. Bracewell because of oral representations or promises by Charles L. Bracewell to provide care, support, assistance for life and that W.T. Bracewell and Irene L. Bracewell would maintain possession of said 160 acres for life?

*ANSWER:* "We do" or "We do not"

*ANSWER:* ⸺⸺⸺⸺⸺⸺

*JURY QUESTION 4:*

Do you find from a preponderance of the evidence that W.T. Bracewell and Irene L. Bracewell placed the title to the 56 acre tract in the name of Charles L. Bracewell because of oral representations or promises by Charles L. Bracewell to provide care, support, and assistance for life and that W.T. Bracewell and Irene L. Bracewell would maintain possession of said 56 acres for life?

*ANSWER:* "We do" or "We do not"

*ANSWER:* ⸺⸺⸺⸺⸺⸺

*JURY QUESTION 5:*

Do you find from a preponderance of the evidence that Charles L. Bracewell failed to perform the agreement set forth in *Jury Question 3*?

*ANSWER:* "We do" or "We do not"

*ANSWER:* ⸺⸺⸺⸺⸺⸺

*JURY QUESTION 6:*

Do you find from a preponderance of the evidence that Charles L. Bracewell failed to perform the agreement set forth in *Jury Question 4*?

*ANSWER:* "We do" or "We do not"

*ANSWER:* ⸺⸺⸺⸺⸺⸺

ing 21 questions. The son requested a charge

In his appellate brief, the son argues that the trial court should have submitted a broad-form question asking whether the son performed his obligations under the agreements. *See Island Recreational Dev. Corp. v. Republic of Texas Sav. Ass'n,* 710 S.W.2d 551, 554–55 (Tex.1986). This is different from his trial objection, which was that the charge omitted the elements of contract formation, thus suggesting the existence of a contract. Accordingly, we hold that the son has waived any complaint concerning broad-form issue submission. *See* Tex.R.App. P. 33.1(a).

We overrule point of error two.

### Conclusion

We affirm the judgment of the trial court.

### OPINION ON MOTION FOR REHEARING AND MOTION FOR EN BANC RECONSIDERATION

The appellant has filed a motion for rehearing and a motion for en banc reconsideration. The panel denies the motion for rehearing, and the en banc Court denies the motion for en banc reconsideration.

It is so **ordered**.

En banc Court consists of Chief Justice SCHNEIDER and Justices COHEN, MIRABAL, O'CONNOR, WILSON, ANDELL, TAFT, and NUCHIA.

Justice O'CONNOR dissents from the denial of en banc reconsideration.

O'CONNOR, Justice, dissents from denial of en banc rehearing.

I dissent from the denial of the motion for en banc rehearing. I believe the panel's opinion is profoundly flawed, for all the

containing 32 questions.

reasons stated in Charles L. Bracewell's motion for en banc rehearing.