**RESCAR, INC., Appellant,**

v.

**James WARD, Appellee.**

**No. 01–99–00038–CV.**

Court of Appeals of Texas, Houston (1st Dist.).

July 5, 2001.

Rehearing Overruled Dec. 6, 2001.

Joseph M. Nixon, William J. Boyce, Houston, Shayle P. Fox, Daniel R. Madock, Chicago, IL, for appellant.

Stuart M. Nelkin, Houston, for appellee.

Panel consists of Justices WILSON, HEDGES, and SMITH.*

## OPINION

WILSON, Justice.

Rescar, Inc., appellant, challenges the $3,312,055 judgment following a jury trial after its termination of its at-will employee, James Ward, appellee. We reverse the finding of intentional infliction of emotional distress and render that the judgment be reduced to reflect Ward takes nothing on that cause of action. We affirm on all other grounds.

### I. Facts

Rescar repairs and cleans railroad tank cars at three facilities in Texas. Ward was hired as an at-will employee and became plant manager for Rescar's Orange, Texas facility in March of 1992. At the time he was hired, Ward was told he would have no authority over the cleaning operation in the plant. Instead, Robert Mitchem, a

* The Honorable Jackson B. Smith, Jr., retired Justice, Court of Appeals, First District of Texas at Houston, participating by assignment.

Rescar vice president, and Fred Keil directed Rescar Cleaning.

In December 1992 a Texas Water Commission (TWC) investigator told Ward that the Orange County Water Control District No. 2 (the District) had discovered a hazardous chemical in its sewer system.[1] The TWC and Ward confirmed Rescar was the source of the chemical. Keil told the TWC and Ward that the chemical entered the sewer by a crack in the pipe that ran directly through the concrete containment pad in the cleaning area. Ward told the TWC he would plug the pipe with concrete. When he did, Mitchem confronted Ward and angrily asked him, "What are you doing plugging into my pipe ... ?"

On March 24, 1993, after independently discovering several other violations of state and federal environmental laws, Ward sent copies of a letter outlining violations since December 1992 to Rescar's owner (Joe Schieszler), President (Bill Groos), and Vice President in charge of Rescar Cleaning (Mitchem). The letter stated, "It is obvious [Rescar Cleaning's] lawless disposal tactics are causing serious environmental violations." Because plugging the pipe in 1992 had caused Ward to get involved in Rescar Cleaning's daily operations, Ward concluded his letter by stating:

> By way of this document, I as Plant Manager of Rescar Incorporated in Orange, Texas hereby notify all involved parties that I am relieving myself of any wrongful misconduct resulting from these illegal proceedings conducted by [Rescar Cleaning].

Don Loyd, Ward's supervisor, told Ward he would have fired him immediately, but Rescar's headquarters told him he "could not fire him immediately and to take care of it."

On April 28, 1993, several members of Rescar's upper management and Ward inspected a field adjacent to Rescar Cleaning. Ward again expressed concern over violations he saw that had obviously not been corrected in the month since he sent the letter.

On May 10, 1993, Loyd told Ward he would be transferred to Rescar's Channelview, Texas facility which was not yet operational.[2] While in Channelview, Ward was responsible for hiring new employees. Despite being instructed by his employer not to hire minorities because they were pro-union, Ward hired a female as a forklift operator and an African American male as paint supervisor.

On December 30, 1993, Loyd terminated Ward. Ward told Loyd that Meryl Whitmeyer, a supervisory employee, told him that morning that Rescar was upset because he hired too many minorities and he was going to be fired.

Less than one month after he was terminated, Ward was contacted by Pat Everett. Everett, who sells coatings to Rescar and has been in the industry for 25 years, told Ward she had attended an industry meeting also attended by Rescar's Executive Vice President, Myron Harkins. Harkins told Everett that Rescar was very upset about Ward's letter outlining the environmental violations, and advised Everett to tell Ward, he would

> find it very difficult to run with the big boys; that [he] wouldn't win if [he] tried

---

1. The chemical was ethyl acrylate. Based on the Material Safety Data Sheet, ethyl acrylate is a known carcinogen that is also toxic to fish and should not be discharged into sewers or waterways. John Schuller, Rescar's paint su-perintendent, testified he and Keil knew it was illegal to dump ethyl acrylate.

2. The Channelview office had recently been acquired from Itel, Ward's previous employer.

it and if [he] pursued it, [he] would not work in the industry anymore, and it could very adversely affect [his wife's] business also.

Everett testified Ward was visibly shaken by Harkins's threat.

Ward sued Rescar alleging wrongful termination, retaliation in violation of the Texas Commission on Human Rights Act (TCHRA), and intentional infliction of emotional distress.

The jury returned a verdict in favor of Ward on all counts. It awarded $2,000,000 in actual damages, reflecting $240,000 for past lost earnings and benefits, $560,000 for future lost earnings and benefits, $150,000 past mental anguish, and $50,000 for future mental anguish for the common-law and statutory termination causes of action, in addition to $1,000,000 for mental and physical pain and suffering caused by Rescar's intentional infliction of emotional distress. The jury awarded an additional $500,000 in exemplary damages and pre- and post-judgment interest.

## II. Common Law Claim

Rescar argues Ward's *Sabine Pilot* claim fails as a matter of law.

■ In reviewing a legal sufficiency or "no evidence" challenge to a jury finding, we must consider the evidence and inferences that tend to support the finding in the light most favorable to the party in whose favor the verdict has been rendered and disregard all evidence and inferences to the contrary. *See State Farm Fire & Cas. Co. v. Simmons*, 963 S.W.2d 42, 44 (Tex.1998). There must be more than a scintilla of evidence in the record to support the finding in order to survive a no-evidence challenge. *Continental Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex.1996).

## A. *Sabine Pilot*

■ The Supreme Court established a very narrow exception to the employment-at-will doctrine, which previously allowed for termination at will and without cause. *Sabine Pilot Serv., Inc. v. Hauck*, 687 S.W.2d 733, 734–35 (Tex.1985). That narrow exception covers only the discharge of an employee for the sole reason that the employee refused to perform an illegal act. *Id.* at 735. The Court further held that in a trial of such a case, it is the plaintiff's burden to prove by a preponderance of the evidence that his discharge was for no reason other than his refusal to perform an illegal act. *Id.*

In Question No. 2 of the jury charge, the jury was asked:

Excluding the opposition to a discriminatory practice which you found was a motivating factor in Rescar, Inc's decision to discharge James Ward, was James Ward discharged for the sole reason he refused to perform an illegal act?

After this question, there was an instruction that explained that an illegal act constituted either (1) violating the Texas Commission on Human Rights Act by discriminating against individuals on the basis of race, sex, and national origin; or (2) intentionally, knowingly, or negligently participating in a list of eight environmental violations. The jury responded that Ward was discharged for the *sole* reason that he refused to perform both the TCHRA illegal acts and the environmental illegal acts.

Rescar objected to this jury question on the ground that there cannot be *two* sole reasons. Ward argues, however, two wrongs do not make a right. Just because Rescar asked Ward to perform two illegal acts does not mean he is prohibited from raising a *Sabine Pilot* claim. We agree.

## B. Illegal Acts

In *Winters v. Houston Chronicle Pub. Co.*, 795 S.W.2d 723 (Tex.1990), the Supreme Court narrowed the *Sabine Pilot* exception even further by holding a plaintiff may only recover if he was "unacceptably forced to choose between risking criminal liability or being discharged." *Id.* at 724. This does not mean an employer must directly confront an employee and make an affirmative statement that the employee will be terminated if he refuses to perform an illegal act. *Higginbotham v. Allwaste, Inc.*, 889 S.W.2d 411, 413 (Tex. App.—Houston [14th Dist.] 1994, writ denied). An employee's refusal to perform an act is an act of insubordination, worthy of discharge. *Id.* As such, when an employer asks an employee to perform some act which is illegal, he automatically puts the employee to the "unacceptable" choice of risking criminal liability or being discharged because the employee is placed under the onus of being terminated for insubordination. *Id.*

Ward testified that, in December 1992, he was contacted by the Texas Water Commission when the Commission found chemicals in a nearby waterway. After investigating the complaint, Ward discovered a pipe in Rescar Cleaning that went directly into the sewer. Rescar Cleaning was using the pipe to dispose of some chemicals. Ward was surprised to discover this pipe, because he had been told Rescar used a closed loop system which would prevent such contamination. Ward testified runoff of chemicals in the sewer was hazardous and could have subjected him to criminal penalties. It was after this incident with the TWC that Ward realized that, despite being expressly told he had no involvement with Rescar Cleaning, he was in fact liable for their environmental violations, given the fact he was the plant manager. The representative from the TWC did not seek out Mitchem, the head of Rescar Cleaning. He wanted to speak with Ward, the plant manager.

Ward testified that, on February 24, 1994, a few months after the TWC incident, George McDermott, Rescar's director of environmental and regulatory administration, wanted a tour of the Orange plant. During the tour, Ward pointed out barrels with improper labels leaking "product," and hoses with product in them, as well. The grass around the hoses showed signs of chemical burns. McDermott said he would discuss the violations with Mitchem.

On March 22, 1993, Ward saw sludge coming out of a PVC pipe in a field. There were limbs covering the pipe in an attempt to conceal it. Ward testified he tested some liquid he found in a field at the same time he found the PVC pipe, and the liquid was acidic and had a chemical smell. Ward realized that, when he sealed the pipe in Rescar Cleaning after the TWC incident, they started dumping directly into the field. Ward testified Mitchem admitted pouring the chemicals on the field. The conditions at Rescar got "extremely worse" the month after the tour with McDermott, so Ward took photographs to document the violations.

He wrote a letter to the president and owner of Rescar, Inc., as well as to Mitchem, the director of Rescar Cleaning. In the letter, Ward outlined Rescar Cleaning's "lawless action" and offered ways to clean up the violations. Upon hearing about the letter, Loyd, Ward's boss, told Ward he wanted to fire him immediately, but he was told to handle it. On April 10, 1993, Loyd sent Ward a letter which stated Ward was in charge of Rescar Cleaning, retroactive to the beginning of the year.

On April 28, 1993, Bill Groos (Rescar's President), Loyd, Mitchem, Keil, and McDermott toured the plant with Ward. There were still no labels on the drums, in violation of environmental laws. Ward told Loyd and Groos he did not believe Mitchem's explanation for the violations, but Loyd and Groos just walked away from him. Less than two weeks later, Ward was told he was being transferred to the Channelview plant.

Loyd remained Ward's boss even after he moved to Channelview. In December 1993, shortly after the Channelview plant became operational, Ward approached Loyd with some environmental concerns about the new facility. One such concern was that the Channelview plant did not have a proper storage facility for the paint. Ward testified that paint is treated similarly to hazardous waste, and there must be a containment area in case there is a spill. Rescar had no such containment area at its Channelview plant. Ward also complained to Mitchem that there was sandblasting being conducted at the new facility without the proper ventilation, thus potentially exposing the workers to silicosis. Mitchem responded that the equipment was broken, and the employees continued to sandblast.

Loyd terminated Ward on December 30, 1993. Ward was told he was being fired due to communication problems. Ward testified Loyd told him he was being fired on that particular day, because if Loyd waited two days longer, he would have to give Ward two weeks of vacation pay.

In Jury Question No. 2, the jury was informed that an illegal[3] act meant intentionally, knowingly, recklessly, or negligently doing any of the following:

1. disposing of any pollutant or hazardous substance in violation of the environmental laws of the State of Texas or the United States

2. as a member of management, permitting or allowing the disposal of any pollutant or hazardous substance in violation of the environmental laws of the State of Texas or the United States

3. releasing or introducing into the sewer system of any pollutant or hazardous substance in violation of the environmental laws of the State of Texas or the United States

4. as a member of management, permitting or allowing the release or introducing into the sewer system of any pollutant or hazardous substance in violation of the environmental laws of the State of Texas or the United States

5. storing of any pollutant or hazardous substance in violation of the environmental laws of the State of Texas or the United States

6. as a member of management, permitting or allowing the storage of any pollutant or hazardous substance in violation of the environmental laws of the State of Texas or the United States

7. introducing into a publicly owned water treatment facility any pollutant or hazardous substance which causes such facility to violate the environmental laws of the State of Texas or the United States or permits issued to such facilities under those laws

8. as a member of management, permitting or allowing the introduction

---

3. Ward's environmental expert, Jim Haley, was with TNRCC for 15 years and had served as Chair of a Texas–Federal interagency committee regarding criminal enforcement of environmental laws. He confirmed that the environmental violations Ward encountered were prohibited by state and federal laws which call for criminal penalties.

into a publicly owned water treatment facility any pollutant or hazardous substance which causes such facility to violate the environmental laws of the State of Texas or the United States or permits issued to such facilities under those laws

There was more than a scintilla of evidence in the record to support the jury's finding that Ward was discharged for the sole reason he refused to perform one of these illegal acts. *See Cazarez*, 937 S.W.2d at 450.

## C. Election of Remedies

Although a party may assert any and all causes of action it may have against another, it will be limited to only one recovery of damages. *Thywissen v. Cron*, 781 S.W.2d 682, 687 (Tex.App.—Houston [1st Dist.] 1989, writ denied). A party who seeks redress under two or more theories of recovery for a single wrong must, before judgment is rendered, elect the remedy it wishes the court to enter judgment upon. *Star Houston, Inc. v. Shevack*, 886 S.W.2d 414, 422 (Tex. App.—Houston [1st Dist.] 1994, writ denied). A party is entitled to the greatest relief under any theory that the verdict will support. *Id.*

Having held the record supports the verdict on Ward's *Sabine Pilot* claim relating to the environmental violations, we need not review the jury's common-law and statutory findings on the alleged violations of the Texas Commission on Human Rights Act or alleged violations of the Labor Code.

## D. Damages

Rescar argues the evidence is legally and factually insufficient to support the jury's findings of actual damages.

When reviewing a factual sufficiency challenge, we must consider all of the evidence supporting and contrary to the finding. *Plas–Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex.1989). The jury finding should be set aside when the supporting evidence is so weak as to render the finding clearly wrong and manifestly unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986). In ordering a remittitur of excessive damages, we must examine all of the evidence in the record to determine whether sufficient evidence supports the damage award, remitting only if some portion is so factually insufficient or so against the great weight and preponderance of the evidence as to be manifestly unjust. *Pope v. Moore*, 711 S.W.2d 622, 624 (Tex.1986).

The jury awarded Ward $240,000 for lost earnings and employee benefits in the past (between the date of discharge and the date of trial). Ward testified he was paid $67,000 a year and received a company car. After his termination, Ward sent his resume and letters to numerous places. He called several people, including headhunters, and even attempted to get work through the Professional Railroad Placement Services. Ward estimated he contacted 50 companies seeking employment. No one expressed interest in hiring Ward, so he began working for On–Track Railcars, a company his wife owned, inspecting railcars. He was paid $40,000 a year with On–Track Railcars, and received minimal benefits.

Ward's economic expert testified Ward's economic losses to the date of trial were $240,466. Rescar's economic expert did not calculate any lost benefits, and he testified Ward's past economic losses were $113,000.

The jury awarded Ward $560,000 for lost earnings and employee benefits that, in reasonable probability will be lost in the

future. Ward's economic expert testified Ward's future economic losses were between $793,988 and $934,018, and Rescar's expert estimated the future economic losses were $437,818.

We find there was legally and factually sufficient evidence to support the jury's award of past and future economic losses.

■ The jury also awarded Ward $150,000 for mental anguish in the past and $50,000 for mental anguish in the future.

■ In Texas, a party may recover damages for mental anguish without having suffered any physical injury. *Shevack,* 886 S.W.2d at 418–19. However, to recover damages for mental anguish, one must show more than mere worry, anxiety, vexation, embarrassment, or anger. *Phar–Mor, Inc. v. Chavira,* 853 S.W.2d 710, 712 (Tex.App.—Houston [1st Dist.] 1993, writ denied). Mental anguish is defined as a high degree of mental suffering, beyond disappointment, anger, resentment, or embarrassment, although it may include all of these. *Id.* The proof must show such painful emotions as grief, severe disappointment, indignation, wounded pride, shame, despair, or public humiliation. *Id.* Jurors are best suited to determine whether and to what extent a defendant's conduct caused compensable mental anguish by referring to their own experience. *Shevack,* 886 S.W.2d at 418–19. Matters of pain and suffering are necessarily speculative, and it is within the province of the jury to set the amount of such damages. *Rosenboom Mach. & Tool, Inc. v. Machala,* 995 S.W.2d 817, 829 (Tex.App.—Houston [1st Dist.] 1999, pet. denied).

Ward's wife testified that, after her husband was terminated, he paced a lot, was very nervous, and had stomach problems so bad that he could not keep anything down. He became withdrawn and quiet.

Ward contacted a doctor who prescribed Zantac and Tagamet for his stomach problems.

Ward went to a psychiatrist 32 months after the termination. Based on Ward's description of his maladies, the psychiatrist concluded Ward's "major depression was mild to medium" in severity and cleared up on its own without treatment. The psychiatrist also testified Ward still gets upset, anxious, and has stomach problems when he has to go to Rescar to inspect railcars as is sometimes required in his work for On–Track Railcars.

Given the evidence before us, we will not disturb the jury's province in determining the award of emotional damages. *See Machala,* 995 S.W.2d at 829.

### III. Statutory Claim

Rescar contends Ward cannot obtain a $2.5 million judgment based on his Labor Code claim. Rescar argues there is no evidence of discriminatory conduct, and Ward's statutory damages are capped at $540,000.

Having found the evidence supported the award of damages under *Sabine Pilot,* we need not address the statutory causes of action.

### IV. Intentional Infliction of Emotional Distress

Rescar argues there is no evidence to support the jury's finding that it intentionally inflicted emotional distress. The trial court denied Rescar's motion for instructed verdict, motion to disregard, motion to modify the judgment, and motion for new trial relating to Ward's claim of intentional infliction of emotional distress.

■ To recover for intentional infliction of emotional distress, a plaintiff must prove that: (1) the defendant acted intentionally or recklessly; (2) the defendant's

conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff emotional distress; and (4) the emotional distress suffered by the plaintiff was severe. *Twyman v. Twyman*, 855 S.W.2d 619, 621 (Tex.1993); *Colson v. Grohman*, 24 S.W.3d 414, 421 (Tex.App.—Houston [1st Dist.] 2000, pet. denied). Rescar argues its termination did not rise to the level of "extreme and outrageous" conduct, and Ward's emotional distress was not "severe." We agree.

"Extreme and outrageous conduct" is conduct so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. *Natividad v. Alexsis, Inc.*, 875 S.W.2d 695, 699 (Tex.1994); *Beiser v. Tomball Hosp. Authority*, 902 S.W.2d 721, 725 (Tex.App.— Houston [1st Dist.] 1995, writ denied). Whether a defendant's conduct may reasonably be regarded as extreme and outrageous is a question of law. *Wornick Co. v. Casas*, 856 S.W.2d 732, 734 (Tex.1993).

We have previously held that, even when the employer's conduct rises to the level of illegality, except in the most unusual cases, it is not the sort of conduct, deplorable as it may sometimes be, that constitutes extreme and outrageous conduct. *Beiser*, 902 S.W.2d at 725; *but see Higginbotham*, 889 S.W.2d at 416 ("Unlawful conduct is intolerable in a civilized community" and can be extreme and outrageous conduct.).

In *Beiser*, Tomball Regional Hospital allegedly fired Beiser after he notified the Food and Drug Administration that the hospital was storing patient blood samples and donor units of blood in violation of FDA regulations. *Id.* at 723. In Beiser's whistleblower case, we held the hospital's actions did not rise to the level of intentional infliction of emotional distress. *Id.* For the same reasons as in

*Beiser*, Ward's allegations that Rescar terminated him for failing to perform illegal acts do not, as a matter of law, constitute extreme and outrageous conduct.

Ward also claims Rescar's threat to "blackball" him in the industry was an intentional infliction of emotional distress. Liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. *See Gaspard v. Beadle*, 36 S.W.3d 229, 238 (Tex.App.—Houston [1st Dist.] 2001, pet. denied); RESTATEMENT (SECOND) OF TORTS, § 46 (1977). We need not condone or agree with Rescar's conduct to conclude that, as a matter of law, it falls short of being "beyond all possible bounds of decency," "atrocious," and "utterly intolerable in a civilized community." *See Diamond Shamrock Refining v. Mendez*, 844 S.W.2d 198, 202 (Tex.1992) *quoting* RESTATEMENT § 46, comment d.

We now review the expert testimony at trial regarding Ward's emotional distress. Richard Pesikoff, M.D., a psychiatrist, testified he examined Ward for 45 minutes on three separate occasions. The first meeting, which took place on August 20, 1996, basically consisted of Ward telling Dr. Pesikoff about the lawsuit and the facts surrounding his termination. After Dr. Pesikoff's recitation of the history conveyed to him by Ward, Dr. Pesikoff testified he came to the opinion that Ward had suffered major depression that lasted one year, but cleared up on its own. Ward had suffered from a mild to medium form of major depression, but he did not suffer from severe depression.

Dr. Pesikoff last examined Ward on January 13, 1998, during which Ward explained that he had been keeping busy doing his own consulting work; his marriage was going well; his moods were pretty good/normal; his stomach some-

times got upset when he had to go out to Rescar; he still had some anxiety; his sleeping was good; he had no sexual problems; he was socially active and seeing people; he was no longer nervous and edgy; he had gone back to school to take some classes; he was seeing more friends; and he was exercising again. Dr. Pesikoff re-evaluated Ward and came to the opinion Ward had fully recovered from his depression and did not need any treatment. Dr. Pesikoff did explain, however, that a patient who has suffered from major depression is more vulnerable to suffer from it again, but he is more likely to seek treatment at an early stage to shorten its duration.

Dr. Pesikoff explained there are numerous life stresses that could be a cause of depression, including divorce. Ward divorced his first wife in 1992, and he was terminated in December of 1993. Dr. Pesikoff testified the causes of Ward's depression, based on the history provided by Ward, were: pre-termination—he felt uncomfortable that his supervisors were unhappy with his hiring minorities and he felt he was in trouble for doing the right thing, and post-termination—his depression was caused by being blackballed in the industry and the threats to his wife's business. The only expert testimony on the degree of emotional distress sustained by Ward indicated his depression was a "serious psychiatric disorder" that cured itself in a year.

█ "Severe emotional distress" means distress so severe that no reasonable person could be expected to endure it. *GTE Southwest, Inc. v. Bruce,* 998 S.W.2d 605, 618 (Tex.1999); *Fields v. Teamsters Local Union No. 988,* 23 S.W.3d 517, 533 (Tex. App.—Houston [1st Dist.] 2000, pet. denied). We recognize that determining whether reasonable minds could differ as to the requisite level of severity is a diffi-

cult threshold issue. *See Fields,* 23 S.W.3d at 534. What is unquestionably reasonable to one person may be clearly unreasonable to another. *See id.* Emotional distress was held to be severe when a plaintiff feared for his life, slept with a pistol, cried in public, and lost his appetite. *Behringer v. Behringer,* 884 S.W.2d 839, 844–45 (Tex.App.—Fort Worth 1994, writ denied). Similarly, emotional distress was held to be severe when a plaintiff refused to speak or see anyone, became ill and disoriented, and experienced extreme anger. *Tidelands Auto. Club v. Walters,* 699 S.W.2d 939, 945 (Tex.App.—Beaumont 1985, writ ref'd n.r.e.). In contrast, feelings of anger, depression, and humiliation (even when embarrassed in front of one's children), are insufficient to constitute severe distress. *Regan v. Lee,* 879 S.W.2d 133, 136–37 (Tex.App.—Houston [14th Dist.] 1994, no writ).

We hold Ward did not suffer emotional distress to the degree required to recover for intentional infliction of emotional distress. While his distress may have been "serious," the evidence did not support a finding that it was "severe." We hold the evidence was insufficient as a matter of law to support a finding that Ward's emotional distress was severe.

We sustain Rescar's point of error as it relates to Ward's claim for intentional infliction of emotional distress. We reverse and render judgment that Ward's recovery be reduced by $1,000,000 to reflect he takes nothing on his intentional infliction of emotional distress claim.

### V. Punitive Damages

█ The jury awarded $500,000 in punitive damages after it found Rescar acted with malice. Rescar argues this finding fails as a matter of law, because the record is insufficient to establish the "clear and

convincing" level of evidence needed to show malice.[4]

Consistent with *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 16–17 (Tex.1994), the trial court, on Rescar's motion, bifurcated the trial reserving the issue of exemplary damages until after malice was determined.

The jury was asked if it found by "clear and convincing evidence that the harm to James Ward resulted from malice." It was then provided the following definition of "malice" based on Texas Civil Practice and Remedies Code section 41.001(7):

> (a) a specific intent by Rescar to cause substantial injury to James Ward;
>
> or
>
> (b) an act or omission by Rescar,
>
>> (i) which, when viewed objectively from the standpoint of Rescar at the time of its occurrence, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and
>>
>> (ii) of which Rescar had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others.

*See* TEX. CIV. PRAC. & REM.CODE ANN. § 41.001(7) (Vernon 1997). Because neither party objected to this instruction, we are bound to review the evidence in light of this definition. *City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 71 (Tex.2000).

Every tort involves conduct that the law considers wrong, but punitive damages are proper only in the most exceptional cases. *Cazarez*, 937 S.W.2d at 454. Rescar, citing *Wal–Mart Stores, Inc. v.*

*Holland*, 956 S.W.2d 590 (Tex.App.—Tyler 1997), *rev'd on other grounds*, 1 S.W.3d 91 (Tex.1999), argues, as a matter of law, this is not such an exceptional case to warrant punitive damages.

In *Holland*, Wal–Mart allegedly terminated an employee after for filing a worker's compensation claim. Holland injured her back on the job. She informed her boss of the injury, but was told she had to continue lifting heavy objects. After lifting one such object, she exacerbated her back injury and was unable to return to work. *Id.* at 597. The definition of "malice" submitted to the *Holland* jury was substantially different than the one submitted in our case. In essence, that definition required evidence showing Wal–Mart must have had actual awareness the act would, "in reasonable probability, result in human death, great bodily harm, or property damage." *Id.* The Tyler Court held there was no evidence of malice, given the fact Holland did not provide any doctor-ordered medical restrictions to her supervisor; therefore, he could not have had the requisite awareness that great bodily harm would result from his ordering her to continue lifting. *Id.*

Here, the question of "harm" to Ward is a bit more complicated. Rescar was certainly aware of the environmental violations and the potential criminal liability which could be imposed on Ward, its plant manager. Ward pointed out the various violations on no fewer than four occasions. The "harm," however, is not the harm caused by the environmental violations, because Ward, personally, suffered no harm from Rescar's environmental practices. If Ward had brought a suit alleging silicosis from the sandblasting, that would be a different matter, and part (b) of the defini-

---

4. Rescar does not argue the amount awarded is excessive; it simply argues there is no

evidence to support the finding.

tion of "malice" relating to Rescar's acts or omissions would apply.

The suit before us, however, is one for wrongful termination. The "harm" to Ward is therefore the loss of his employment in the future, and we must determine if "there was a specific intent by Rescar to cause substantial injury to James Ward."

Ward testified Rescar "blackballed" him in the rather close-knit railroad community, giving him no choice but to work for his wife at a substantially decreased salary. These events were connected to the method used to terminate Ward.

Pat Everett, who had been in the industry for more than 25 years, testified she was approached by Rescar's Executive Vice President while attending an industry meeting. Everett, who has never worked for Rescar, was told by Rescar's officer that Ward would find it "difficult to run with the big boys," and he "would not work in the industry anymore."

Ed Mooneyham became plant manager at Rescar's Channelview, Texas plant six months after Ward was terminated. Mooneyham testified that Ward was sent by Shell to inspect some of the railcars at Rescar. When Rescar management found out about Ward's presence, Mooneyham was asked to tell Shell not to send Ward. There was additional testimony from Ward's psychiatrist that Ward told him Rescar had called G.E. Capital and asked them not to hire Ward, because that would adversely affect Rescar's relationship with G.E. Capital.

We hold the testimony was sufficient to show malice because Rescar exhibited specific intent to cause substantial injury to Ward, continuing even after Rescar terminated him.

We overrule the punitive damages point of error.

## VI. Other Errors in Record

Rescar further argues the case should be remanded because the trial court's errors during the trial were manifest on the record.

### A. Improperly Admitted Evidence

#### 1. Environmental Record

 Rescar claims that over its objections, the trial court allowed evidence of Rescar's environmental record for times other than when Ward was employed.

 A person seeking to reverse a judgment based on evidentiary error need not prove that but for the error a different judgment would necessarily have been rendered, but only that the error probably resulted in an improper judgment. *City of Brownsville v. Alvarado,* 897 S.W.2d 750, 753 (Tex.1995); *Bracewell v. Bracewell,* 31 S.W.3d 610, 614 (Tex.App.—Houston [1st Dist.] 1999, no pet.).

The trial court granted Rescar's motion in limine and instructed the parties that before any testimony was introduced about Rescar's environmental records and violations for any facility other than Orange and Channelview, they must approach the bench and get a ruling. The same applied for testimony relating to the Orange and Channelview plants for times when Ward was not employed by Rescar. There was no ruling on the merits, and no error was preserved. *See Hartford Accident & Indem. Co. v. McCardell,* 369 S.W.2d 331, 335 (Tex.1963); *Collins v. Collins,* 904 S.W.2d 792, 798 (Tex.App.—Houston [1st Dist.] 1995, no writ).

After making its ruling on the motion in limine, the trial court asked Rescar if it intended to abide by the rulings, as well. Rescar's attorney stated, "My understanding [sic] if I would not abide by them, I would open the door for them to offer

evidence." The trial court agreed and advised that in addition, Rescar would "run afoul of the representation to the Court. These are mutual."

In its opening statement, Rescar's attorney discussed how "Rescar restored [the Channelview] facility and made it clean from the pigpen it was under Mr. Ward." Clearly, this statement referred to Rescar's actions at a time other than when Ward was employed there, namely, after his departure. As such, Rescar opened the door. *See Southwestern Elec. Power Co. v. Burlington Northern R.R.*, 966 S.W.2d 467, 473 (Tex.1998).

■■■ In addition, Rescar refers us to at least 40 pages of allegedly objectionable testimony. At no time in the referenced testimony did Rescar ask to approach the bench and discuss the motion in limine. In fact, none of the objections lodged even relate to the motion in limine. Rescar has waived any error regarding admission of erroneous evidence. *See* Tex.R.App. P. 33.1.

### 2. Hearsay

Rescar also contends the trial court erred in admitting the hearsay "shop rumor" regarding Ward's upcoming termination due to his minority hiring practices. Because the verdict supports another theory of recovery, we need not address the Labor Code claims.

### B. Jury Selection

■■■ Finally, Rescar argues the trial court "skewed" the jury selection process by excluding all business persons and eliminating all "managers" from the jury. A customer service manager, a senior vice president for Chase Bank, and a former GTE Wireless supervisor and Burger King manager were members of the jury. There is no merit to this claim.

### VII. Conclusion

We reverse the judgment insofar as it awards damages for the intentional infliction of emotional distress and render judgment that Ward take nothing on that cause of action. In all other respects, the judgment is affirmed.

JACKSON B. SMITH, J. (Retired), concurring and dissenting.

JACKSON B. SMITH, Jr., Justice (Retired), concurring and dissenting.

I concur with the majority opinion in all respects, except for its reversal of the $1,000,000 damage award to James Ward for intentional infliction of emotional distress. I would affirm the entire trial court judgment.

The majority opinion holds that Rescar's actions toward Ward were neither extreme and outrageous nor Ward's emotional distress sufficient to be classified as "severe." I disagree.

To recover damages for intentional infliction of emotional distress, a plaintiff must prove: (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff emotional distress; and (4) the emotional distress suffered by the plaintiff was severe. *Twyman v. Twyman*, 855 S.W.2d 619, 621 (Tex.1993).

It is manifest from the evidence that Rescar's actions toward Ward were intentional and that Ward suffered emotional distress as a result of those actions. These two matters appear to be uncontested. However, Rescar vehemently contests Ward's claim that Rescar's actions were extreme and outrageous and that the emotional distress Ward suffered was sufficient to be classified as "severe."

The Texas Supreme Court has held that whether a defendant's conduct may reasonably be regarded as extreme and outrageous is a question of law. *Wornick v. Casas,* 856 S.W.2d 732, 734 (Tex.1993). The supreme court also has held that, for a defendant's conduct to be considered extreme and outrageous, the conduct must be "so outrageous in character, and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Twyman,* 855 S.W.2d at 621. That court has further held that bad faith and rudeness cannot reasonably be regarded as so extreme as to go beyond all possible bounds of decency. *Natividad v. Alexsis, Inc.,* 875 S.W.2d 695, 699 (Tex.1994).

## FACTS

The evidence shows that Ward was hired in 1992 by Rescar as a plant manager. Rescar contracted to clean and repair railroad cars. Although Ward was responsible for the entire plant, the cleaning portion of the plant was under the authority of Mitchem and Keil. Mitchem was a Rescar vice-president.

In December 1992, a Texas Water Commission investigator and Ward discovered that Rescar Cleaning (RC) was disposing of hazardous chemical waste in a sewer system. Ward had the pipe plugged through which the chemical was flowing. Mitchem, Rescar's vice-president, asked Ward what he was doing plugging Mitchem's pipe. Shortly thereafter, Ward showed McDermott, Rescar's highest official responsible for environmental issues, a number of chemical drums lying in a field near the RC cleaning area. Some of the drums were unmarked, some mislabeled, and some were leaking. McDermott told Ward that RC would clean up the drums as well as some chemical hoses that had

been dumped in the field. The hoses had spilled chemicals, leaving burned spots on the field. No action was taken by RC to clean up the field.

In March 1993, another pipe was discovered leaking liquid flowing from a sludge separation in the RC area. More hoses and areas of ground contamination also were observed in the same field. Tests revealed that the leaking liquid, black sludge, was highly acidic.

Ward was becoming increasingly concerned about the environmental hazard being created and its potential effect on the public. He also was well aware of his own responsibilities and, as plant manager, he was the person who could be found guilty of violating federal and state environmental laws. To protect himself, Ward wrote letters to the owner, the president of Rescar, as well as the vice-president of RC. In those letters, Ward outlined the various violations taking place in the RC area. He recommended immediate remedial action, and disclaimed any responsibility for any misconduct resulting from RC's illegal activities.

Upon hearing of Ward's letter, Dan Loyd, Ward's immediate supervisor, wanted to fire Ward. However, Loyd was told, "he could not fire him immediately and to take care of it."

On April 10, Loyd sent Ward a memorandum stating that, effective January 1, 1993, Ward had been given authority over RC's cleaning area.

Loyd did not know if anyone had told Ward about his changed responsibilities before he sent the memo to Ward on April 10. Ward was upset when he received the memo, because he was the one who had reported to Rescar's officers the various violations that had occurred between January 1, 1993 and April 10, 1993, and now, the company was trying to place the re-

sponsibility on him by giving him an organizational chart that had been back-dated by approximately four months. Ward and others had never seen or heard of the chart prior to April 10.

Shortly thereafter, in May 1993, Ward was transferred to another Rescar plant that was not operational at that time. Ward was responsible for hiring new employees. During the balance of 1993, Ward and his supervisor, Loyd, had several confrontations concerning the hiring of employees and, on December 30, 1993, Loyd terminated Ward's employment. Meryl Whitmeyer, a Rescar supervisory employee, told Ward that morning that he was going to be fired because he had hired too many minorities. Loyd had accomplished what his supervisors had told him to do in March 1993, "he could not fire him [Ward] immediately and to take care of it."

Less than a month after Ward's termination, Pat Everett, a sales person, informed Ward of a conversation she had had with Rescar's executive vice-president, Myron Hawkins. She said Hawkins told her that Rescar officials were very upset by Ward's letter which informed them of the company's various violations. She said that Hawkins then told her to tell Ward that: (1) Ward and Geri (Ward's wife) would find it difficult to run with the big boys; (2) that he would not win if he tried and pursued; (3) he would not work in the industry anymore; and (4) it could adversely affect Ward's wife's business.

Hawkins's threat and caveat sent to Ward was not an idle threat. Notwithstanding his qualifications and extensive experience in the specialized cleaning and repairing rail car industry, Ward was unable to obtain and retain employment. Rescar formulated a plan that, when Ward obtained employment with Shell Oil, a Rescar vice-president would request Shell not to send Ward to inspect Shell's own railcars that Rescar worked on for Shell. When Ward was employed by GE, Rescar contacted GE and told it that employing Ward would hurt Rescar's relationship with GE. Ward finally went to work for his wife's company at a much lower salary than he would have made in the cleaning and repairing railcar industry.

It is not unusual for an employer to terminate an at-will employee when disputes arise. In fact, it is well established that an employer does not need a reason to terminate an at-will employee. *See Montgomery County Hosp. Dist. v. Brown*, 965 S.W.2d 501, 503 (Tex.1998). It is not even unusual when heated disputes arise between two parties that threats may be made. However, when an employer terminates an employee, threatens to ruin that employee's ability to ever obtain employment, and then carries through on the threats by exerting pressure and leverage on the former employee's new employers to such an extent that the former employee cannot keep employment, all of which Rescar did, the employer's actions exceed common decency and become extreme and outrageous.

To add insult to injury, Rescar's executive vice president also threatened to take action that would affect the business of Ward's wife. The continuity of Rescar's actions to remonstrate and even harm Ward make it readily apparent that Rescar intended to inflict as much emotional distress upon Ward, and his family, as it possibly could. This evidence is sufficient to support the jury's verdict that Rescar's actions toward Ward were intentional and its conduct was extreme and outrageous.

Rescar also asserts that Ward is not entitled to recover damages for intentional infliction of emotional distress because Ward did not introduce sufficient proof to demonstrate "severe" emotional distress.

The question of whether evidence is sufficient to classify emotional distress as severe is a two-step process. First, the trial court must determine as a matter of law whether the evidence is such that severe emotional distress can be found. Second, if the trial court answers the first question affirmatively, whether severe emotional distress in fact exists becomes a question for the finder of fact to determine from the evidence. RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (1965); *Behringer v. Behringer,* 884 S.W.2d 839, 844 (Tex.App.—Fort Worth 1994, writ denied); *Tidelands Auto. Club v. Walters,* 699 S.W.2d 939, 945 (Tex. App.—Beaumont 1985, writ ref'd n.r.e.).

In this case, because the trial court submitted the question of severe emotional distress to the jury, it, of necessity, found as a matter of law that the evidence was such that the jury, if it chose to do so, could find that there had been intentional infliction of severe emotional distress on Ward by Rescar.

At what point emotional distress becomes *severe* emotional distress is a matter of degree and depends upon the specific facts of each case. Other than enumerating specific factual situations that do or do not constitute severe emotional distress, case law has not established firm or specific standards to determine what constitutes sufficient emotional distress to classify it as severe.

In a case factually similar to the instant case, a former employer phoned the ex-employee and told her that she would ruin her, would call any employer she worked for and get her fired, would get her for setting her up, and that the ex-employee had better watch her back always, and watch her children always. For approximately two years "hang-ups" were made by the employer to the ex-employee's business. The employer's actions caused the ex-employee debilitating headaches and se-

vere emotional distress. The former employer sent a black floral arrangement to the ex-employee, which was interpreted as a death threat and caused the ex-employee to become paranoid. The jury found severe emotional distress. The appellate court held that there was some evidence to show that the findings of fact by the jury were not clearly wrong or manifestly unjust. *Qualicare of East Texas, Inc. v. Runnels,* 863 S.W.2d 220, 223 (Tex.App.— Eastland 1993, no writ).

More recently, the Texas supreme court affirmed a judgment awarding damages for intentional infliction of emotional distress where employees suffered illness as a result of a supervisor's continued verbal abuse and threatening gestures. *GTE Southwest, Inc. v. Bruce,* 998 S.W.2d 605, 618 (Tex.1999).

In *Bruce,* the court held that severe emotional distress is distress that is so severe that no reasonable person could be expected to endure it. *Id.* The evidence in *Bruce* showed that three employees experienced a variety of symptoms, including crying spells, emotional outbursts, nausea, stomach disorders, difficulty sleeping and eating, stress, anxiety, depression, and fear. This evidence was held to be legally sufficient to support the jury's findings that the three employees suffered severe emotional distress. *Id.*

In the instant case, Rescar attempted, by backdating an organizational chart, to shift the responsibility to Ward for its own unlawful activities in disposing of waste. Rescar used a false pretext to dismiss Ward, made threats to keep Ward from ever working in the industry, and threatened to harm Ward's wife's business. These combined actions apparently made Ward ill.

The evidence shows that Ward became upset and depressed when Rescar termi-

nated his employment. When Everett informed Ward of Rescar's threats toward Ward's wife, Ward's condition worsened. The evidence describing Ward's lifestyle before and after Rescar's actions makes it apparent that Ward changed from being a happy person to being a very depressed person. He developed eating disorders, would not leave his home, and developed stomach problems. His problems with Rescar weighed on his mind continuously, resulting in loss of sleep. This in turn caused Ward to be nervous, edgy, irritable, moody, and diminished his ability to think clearly or concentrate. During this time, Ward lost interest in doing things that he had enjoyed previously. He became defensive and lacked motivation. His condition deteriorated to the point where he refused to drive a car. During this period of depression his weight dropped from 190 to 160 pounds.

Ward's expert witness, Dr. Pesikoff, testified that Ward's condition was major depression. Pesikoff explained that, according to the Diagnositc and Statistical Manual, 4th Edition, there are nine criterion for making a diagnosis of major depression. Pesikoff testified that Ward's condition met six of the nine criterion and only five were necessary to characterize the condition as major depression.

Rescar contends that Ward's emotional distress could not have been severe because he did not seek medical attention. Dr. Pesikoff explained that it is not unusual for a person experiencing depression for the first time not to recognize the symptoms and not to seek medical attention. Pesikoff's testimony was not rebutted, and, although he did not classify Ward's depression as severe, the facts appear to justify the jury's finding that Ward suffered severe emotional distress.

In this case, based on the evidence, the trial court found as a matter of law that severe emotional distress can be found. The court then submitted the proper issue to the jury inquiring whether severe emotional distress in fact existed. The jury answered that it did.

The question of whether severe emotional distress exists is a question of fact. The Texas Supreme Court has admonished courts of appeals that they are never permitted to substitute their opinion for that of the trier of fact merely because they might have reached a different fact conclusion. *Herbert v. Herbert,* 754 S.W.2d 141, 144 (Tex.1988). It is my view of the majority opinion that they are doing what the caveat of the Supreme Court told us not to do; that is, substitute their opinion for that of the fact finder.

I would hold that there is some evidence; that is, legally and factually sufficient evidence, to support the jury's verdict against Rescar on Ward's claim for intentional infliction of emotional distress. Accordingly, I dissent from the majority opinion reversing the award of $1,000,000.00 to Ward for intentional infliction of emotional distress.